[Crim. No. 22228. Second Dist., Div. One., Dec. 11, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ROMAINE FITZGERALD, Defendant and Appellant.

## COUNSEL

Ben Margolis, William B. Murrish and Oliver Wendell Holmes, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FEINERMAN, J.**\*—A jury found defendant Romaine Fitzgerald guilty of first degree murder of Barge Miller and fixed the penalty at death for that offense. A motion for a new trial was denied by the court.

Defendant contends that (1) the evidence was insufficient to sustain the conviction; (2) the trial court violated his constitutional rights by denying his motion for a change of counsel and for a continuance in connection therewith; (3) he was denied the effective assistance of counsel; (4) the trial court abused its discretion in denying his motion for pro se privileges at the jail pending and during trial; (5) the prosecutor committed prejudicial misconduct; (6) the trial judge committed prejudicial error in his comments regarding burden of proof; (7) his identification by witness James Coleman was the result of the deprivation of his constitutional rights to counsel and was impermissibly suggestive; (8) the trial court's denial of his pretrial motion to suppress a fingerprint exemplar violated his constitutional rights; (9) the court erred in permitting the use of a manikin made in the likeness of the victim to illustrate the medical testimony.

A number of additional contentions are raised with regard to the penalty phase of the trial. It is unnecessary to reach these contentions in view of the holding in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (see also *Furman* v. *Georgia,* 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]), that the death penalty is unconstitutional.

We have concluded that the contentions of the defendant set forth above cannot be sustained. The judgment should be modified to provide for life imprisonment, and as so modified, it is affirmed.

### Facts

On the evening of September 28, 1969, Barge Miller was employed as

---

\*Assigned by the Chairman of the Judicial Council.

a security guard by Land Johnson Security at Vons Shopping Center located at El Segundo and Avalon Boulevards in Los Angeles. He was in uniform, carried a revolver and wore a wrist watch. He had driven to work in a white Ford station wagon which he owned.

Shortly before 1:42 a.m. James Coleman, a service station attendant, heard what sounded to him like four gunshots coming from the direction of the Vons Shopping Center parking lot across the street from the service station. He asked a co-worker to call the police and ran across the street where he could see Miller's car parked in the lot. There were fluorescent lights at the parking lot. As he ran toward the car, Coleman saw two men standing near Miller's car. One of the two had the top half of his body inside the open right front door of the car and the other person stood behind him near the back door of the car. As Coleman approached, the man standing near the back door ran away. The other man came out of the car and went back inside and appeared to take something from inside the car. When he came out of the car again, he was holding what appeared to be a gun in his right hand. During the time he was inside the car, the man was bracing himself with his left hand outside the car. Coleman saw the right profile of the man as he came out of the car. He identified this person as being the defendant. The man then turned and ran toward an alleyway.

Coleman testified he did not get a good look at the front of the man's face, but he was sure of his identification of the defendant. He stated that the defendant looked different in court than when he had seen him during the early morning hours of September 29, 1969. The difference was that the defendant's hair was more closely cut than it had been on September 29. However, the facial features were the same. Coleman did not notice any bandages or anything wrong with the defendant's head on September 29, 1969.

When sheriff's deputies arrived on the scene, they found Barge Miller dead in his car. There were four bullet holes in the right front window. Miller's gun was not found and his wrist watch was missing. The car was dusted for fingerprints. A latent fingerprint was lifted from the chrome strip of the right rear door of the car. This was a print of a left thumb facing downward toward the ground. Deputy Sheriff John J. O'Neill, a fingerprint expert, testified that this print matched a fingerprint exemplar of the defendant taken on October 16, 1969. Deputy O'Neill opined that this latent thumbprint was fresh, meaning one day, because a fresh print usually grabs the powder readily. He further stated that the location of the latent thumbprint, which was waist high and pointing downwards, was

consistent with someone leaning into the Ford with his hand on the chrome strip. No other prints were found except "some pieces of palm, and whatnot," which were not identified. The victim's fingerprints were not found in the car. Deputy Sheriff Howard A. Speaks, another fingerprint expert, also testified that the latent thumbprint and defendant's fingerprint exemplar were made by the same thumb.

Coleman talked to several officers concerning the events that had transpired. Sometime later he was shown a group of photographs. He did not pick out a photograph of defendant, although there was a photograph of defendant among the photographs he was shown. He testified that the reason he failed to pick out the photograph of defendant was that he did not want to identify anyone by a picture and preferred to see the suspect in person. Coleman denied telling an officer that he would be unable to identify either suspect. When called as a defense witness, Deputy Sheriff Donald Hopkins testified that when he and his partner, Deputy Charles Anderson, talked to Coleman on September 29, 1969, Coleman had said either, "I do not think I can identify," or "I am not sure I can identify" the suspect.

On cross-examination the defense attorney had Coleman describe the appearance of the trial judge without looking at him. Coleman described the judge as having a moustache and "lightish hair." He stated that the trial judge did not wear glasses and was of "settled age." It was later stipulated that the trial judge did not have a moustache, did wear glasses, and that his hair was light in color.

The defendant testified in his own behalf. He stated that on September 7, 1969, he received a head injury and kept a two-inch wide gauze bandage on the wound for about three or four weeks. He had removed the bandage about three to five days prior to his arrest on October 9, 1969. He denied being in the vicinity of the Vons parking lot during the early morning hours of September 29, 1969, and denied participating in any way in the shooting or robbing of Barge Miller. He testified that he never went outside at night before October 9, 1969, because he did not want to infect his head injury. When he did go outside during the daytime, he covered his head with a hat.

The defendant was wearing a hat when he was arrested on October 9, 1969. At that time he had no identification on his person and gave Joe Burton as his name to the police. The defendant testified that the reason why he gave a false name to the police was that he felt that they had no basis for stopping him. He stated that he had no identification because other officers had taken his driver's license at the time of a prior arrest.

Doris Haughton and her sister, Janice Sadler, testified in behalf of the defendant. They shared an apartment with him and stated that he had not left the apartment on the evening of September 28, 1969. They both indicated that the defendant was in the apartment when they went to bed at approximately midnight and was in the apartment when they awoke on the morning of September 29, 1969. Doris Haughton stated that the defendant never went out at night without being accompanied by either herself or her sister and he was never left alone at home at night. Janice Sadler did not recall whether or not the defendant ever went out at night unaccompanied by either her or her sister.

### Sufficiency of the Evidence

■ Our function is not to reweigh or reinterpret the evidence but simply to determine whether there is sufficient evidence in the record to warrant the inference of guilt drawn by the trier of fact. (*People* v. *Perry,* 7 Cal.3d 756, 785 [103 Cal.Rptr. 161, 499 P.2d 129].) We must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People* v. *Reilly,* 3 Cal.3d 421, 425 [90 Cal. Rptr. 417, 475 P.2d 649]; *People* v. *Mosher,* 1 Cal.3d 379, 395 [82 Cal. Rptr. 379, 461 P.2d 659].)

■ Measured by the benchmarks set forth above, the evidence in this case clearly is sufficient to sustain the conviction. The identification testimony of James Coleman is corroborated by the fingerprint evidence. Coleman testified that as the defendant was leaning inside the passenger side of Miller's car, the defendant braced himself with his left hand outside the car. The latent left thumbprint of the defendant was found on the chrome strip of the right rear door. Deputy Sheriff O'Neill, a fingerprint expert, testified that this thumbprint was fresh. The print was obtained within hours of the shooting of Barge Miller.

The defendant attacks the credibility of witness Coleman and the weight to be given to his testimony. On the record before us, Coleman's testimony was not so inherently improbable and impossible of belief as in effect to constitute no evidence at all. Therefore, it becomes the exclusive province of the jury in this case to determine the credibility of the witness and to determine the facts and the effect and value of the evidence. We find there is substantial evidence to support the jury's conclusion.

### Motion for Change of Counsel and for a Continuance

■ On November 14, 1969, the defendant appeared in the superior court in Los Angeles for arraignment. When the defendant indicated that

he did not have the funds to hire an attorney, the public defender was appointed to represent him. On November 20, 1969, the public defender declared a conflict, and the court appointed Joseph Rosen to represent the defendant. On December 1, 1969, the defendant was arraigned, entered a not guilty plea, and trial was set for January 22, 1970. Rosen died in the latter part of December 1969; so his appointment was vacated and Sam Bubrick was appointed to represent the defendant. On January 14, 1970, the order appointing Bubrick was vacated because of Bubrick having declined the appointment, and Howard Beckler was appointed to represent the defendant. On Beckler's motion, the trial was continued to February 24, 1970, time having been waived by the defendant. On February 9, 1970, the defendant's motions to suppress his handwriting exemplar and to suppress the testimony of witness James Coleman were argued and denied. The motion of the People to permit the use of a manikin to illustrate medical testimony was argued and granted.

The case was called for trial on February 24, 1970, and trailed from day to day until February 27, 1970, because Beckler was engaged in another trial. When the case was called on February 27, 1970, Beckler moved to continue the matter until the end of March or the beginning of April to give the defendant an opportunity to hire private counsel.[1] The court then asked the defendant, "Are you satisfied with Mr. Beckler's representation of you thus far?" The defendant responded, "Yes, I am. But I feel that another attorney may be able to go into, you know, the defense a little more thoroughly." The court denied the motion and expressed an opinion that Beckler would give the defendant excellent representation in the matter.

On his motion for a new trial, after Ben Margolis had been substituted as his attorney in place of Howard Beckler, the defendant filed a declaration in which he stated that Beckler was unwilling to try the case the way the defendant wanted him to try it, namely to present a "frameup defense"

---

[1]Attorney Beckler made the following statement to the court:

"I am ready, and I state very candidly I am ready. The defendant throughout the proceedings has expressed to me a desire to hire and retain private counsel. On each occasion, apparently, he has been unable to and thus far I have contacted people for him and the people that he hopes to hire private counsel have indicated that they intend to keep me in this case.

"However, day before yesterday my mind was made up that that should be determinative of the motion. I am ready, the People are ready, all indications appear that I will be his attorney.

"However, this defendant again expressed to me this morning that the people he's contacted, notwithstanding, he intends to hire private counsel. He is not dissatisfied in the sense of the word that he feels I am incapable or incompetent, but he wants his own attorney."

grounded in the assertion that the People's case was false and manufactured against him in retaliation for the defendant's Black Panther Party membership and his earlier involvement with the police in a shootout on September 7, 1969. The defendant declared that he did not bring this to the attention of the court during the trial because he had been advised by Beckler that the court would probably deny his motion for a continuance and the defendant "did not want to do anything to stop him [Beckler] from trying the case his way if he was going to be my attorney at the trial." A written declaration also was filed by attorney Michael E. Grodsky in which he declared that he represented defendant in another criminal case and that had he known that the defendant had appointed counsel, and that such counsel was receiving a fee in this case, he would have made a motion with the defendant to have himself substituted in place of Beckler and thereby the defendant would have had an attorney who would have presented the case "in a political context."

Defendant's contention that the denial of his motion for a continuance and for "change of counsel" violated his constitutional rights is based partly on the trial record, partly on the declarations filed ancillary to the motion for new trial, and partly on rhetoric, conjecture, and surmise.

Defendant argues, inter alia, that the trial court denied him the opportunity to obtain private counsel of his own choice; that he has an absolute right of free choice regarding the attorney to be appointed to represent him provided the attorney nominated is willing to accept the compensation to be awarded under Penal Code section 987a; that he is entitled to determine with final authority the contents and the basic policies to govern his defense; that the trial court failed to inquire reasonably and sufficiently into his lack of confidence in attorney Beckler as his counsel; that the appointment of attorney Beckler aggravated his denial of a full and fair hearing and due process because Beckler was a white lawyer who could not identify with him as a black accused, and that Beckler was a frequent court-appointed counsel and necessarily lacked positional independence.

■ There are no mechanical tests for determining whether or not a refusal to grant a request for a continuance is so arbitrary as to violate due process of law. In each case it depends upon the circumstances and reasons presented to the trial judge *when the request is made.* (*Ungar* v. *Sarafite,* 376 U.S. 575, 589 [11 L.Ed.2d 921, 931, 84 S.Ct. 841]; *People* v. *Crovedi,* 65 Cal.2d 199, 206-207 [53 Cal.Rptr. 284, 417 P.2d 868]; *People* v. *Byoune,* 65 Cal.2d 345 [54 Cal.Rptr. 749, 420 P.2d 221].)
■ "Criminal defendants are entitled under the federal Constitution to the assistance of court-appointed counsel if they are unable to employ private counsel. [Citation.] 'However, the decision whether to permit a

defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney. ██ "A defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. . . . ██ 'The right of a defendant in a criminal case to have the assistance of counsel for his defense . . . may include the right to have counsel appointed by the court . . . discharged or other counsel substituted, if it is shown . . . that failure to do so would substantially impair or deny the right . . . , but the right to such discharge or substitution is not absolute, in the sense that the court is bound to accede to its assertion without a sufficient showing . . . that the right to the assistance of counsel would be substantially impaired . . . in case the request is not granted, . . .' " ' " (*People* v. *Williams,* 2 Cal.3d 894, 904 [88 Cal.Rptr. 208, 471 P.2d 1008].)

In *People* v. *Marsden,* 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44] it was held that the trial court committed prejudicial error in denying the defendant's motion to substitute new appointed counsel without giving the defendant an opportunity to state the reasons for his request. ██ In the case at bench the defendant was afforded an opportunity to state the reasons for his request—a belief that another attorney may be able to go into the defense "more thoroughly." At no other time was any complaint articulated to the court, at no time did the defendant ever suggest an attorney for appointment by the court, and at no time did the defendant indicate that he would have the financial ability, either by himself or through friends or relatives, to retain private counsel. Considering all the circumstances of this case, we find no abuse of discretion in denying the motion for continuance.

"The fairness of a trial is not to be predicated on any purported right of an accused to proceedings which are planned, directed or conducted by him, but rather on proceedings which will accord him the fullest opportunity to preserve all trial rights and successfuly defend against the charges. Moreover, if an accused has been accorded a fair trial, subtle analyses which pretend to establish that he might have been better defended had different counsel or tactics been employed, cannot require by hindsight a conclusion that the trial was not, in fact, fair." (*People* v. *Sharp,* 7 Cal.3d 448, 460 [103 Cal.Rptr. 233, 499 P.2d 489].)

We reject the concept advanced by the defendant that he had an inchoate constitutional right to nominate the counsel assigned to him pursuant to

Penal Code section 987a (and the alleged corollary right to have the court advise him of his right to nominate assigned counsel).[2] The adoption of such a policy could be destructive of sound judicial administration and would be contrary to the best interests of most indigent defendants. An indigent can best defend against criminal charges when competent counsel is appointed. (See *People* v. *Sharp, supra,* 7 Cal.3d 448, 460-461.) We do not quarrel with the proposition that the input received by the judge in determining what attorney to appoint can also include a suggestion made by a defendant. In some cases it may be appropriate to follow the suggestion, but the ultimate discretion to make the specific appointment must be vested in the court. A contrary policy could give hostile or disruptive defendants an incentive to make impossible demands upon the court. Such demands could take the form of requests for unavailable lawyers or lawyers unqualified to handle a particular matter. It could result in capping for "popular" attorneys amongst defendants awaiting trial in jail. For sound policy reasons, it has been held that an indigent defendant does not have the right to representation by a particular lawyer. (*People* v. *Aikens,* 70 Cal.2d 369, 378 [74 Cal.Rptr. 882, 450 P.2d 258]; *People* v. *Massie,* 66 Cal.2d 899, 910 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Hughes,* 57 Cal.2d 89, 98-99 [17 Cal.Rptr. 617, 367 P.2d 33].) We concur.

The defendant's contention that he was entitled to have another attorney appointed, because of an alleged conflict between himself and his court-appointed counsel, has no merit. " '[T]here is no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims.' [Citations.] Further, it is well established that an attorney representing a criminal defendant has the power to control the court proceedings." (*People* v. *Floyd,* 1 Cal.3d 694, 704 [83 Cal.Rptr. 608, 464 P.2d 64].)[3]

We also reject the contention that the race of the assigned attorney should be a criteria for appointment. Any limitation on court appointments based on race or ethnic factors has no place in the administration of justice. The right to be free from discrimination is an individual right, and it should not be abridged or modified on the basis of an individual's race or

---

[2]We are aware of the decision of the First District Court of Appeal, Division 4, in *Drumgo* v. *Superior Court* (Cal.App.) 103 Cal.Rptr. 100 (hg. granted by the Supreme Court on August 24, 1972).

[3]See the following comment in the Tentative Draft of the American Bar Association Project on Standards for Criminal Justice, Standards Relating to The Prosecution Function and The Defense Function, page 146, "It would be difficult to imagine anything which would more gravely demean the advocate or undermine the integrity of our system of justice than the idea that a defense lawyer should be simply a conduit for his client's desires."

other ethnic factors. The deliberate preference for an individual of one race, and solely because of his race, over an individual of another race, even in cases where the latter individual is better qualified in all other respects, is a grave injustice and an unconscionable violation of constitutional principles of equal protection. (Cf. *Hughes* v. *Superior Court,* 339 U.S. 460 [94 L.Ed. 985, 70 S.Ct. 718]; Cal. Lab. Code, § 1420, subd. (a); Federal Civil Rights Act of 1964, tit. VII, § 703(j).)

Defendant's contention that attorney Beckler lacked "positional independence" because of frequent appointments under Penal Code section 987a by the judges of the Los Angeles Superior Court, thereby denying the defendant a fair trial, has no basis in the record of this proceeding. Our review indicates that Beckler was a zealous advocate for his client at all times. He represented his client vigorously within the rules of law and standards of professional ethics.

The defendant is also critical of the "camaraderie" between prosecution and defense counsel and finds this inconsistent with the "true quality of adversary representation." "Basic to an efficient and fair functioning of our adversary system of justice is that at all times there be an atmosphere manifesting mutual respect by all participants. This can be achieved only by strict adherence to firm standards of what may be called, for want of better terms, professional etiquette and deportment. There is no place and no occasion for rudeness or overbearing, oppressive conduct." (Tentative Draft, American Bar Association Project on Standards for Criminal Justice, Standards Relating to The Prosecution Function and The Defense Function, pp. 257-258.)

### Effective Assistance of Counsel

■ Defendant contends that attorney Beckler's representation was so inadequate as to deny defendant his constitutional right to effective representation by counsel. Defendant concedes that most of the proper "formal steps" were taken by defense counsel, but he asserts that what was lacking was the "substance" of the required advocacy. We have examined the record and do not find that "counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.'" (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) ■ "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations]. Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People* v. *Floyd, supra,* 1 Cal.3d

694, 709.) The defendant has not met this burden. (Cf. *In re Saunders,* 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921].)

### Motion for Pro Se Privileges at the Jail

We find no abuse of discretion in the denial of defendant's motion for pro se privileges at the jail while he awaited trial (including the rights to prisoner-available legal research materials, to make telephone calls and to confer with witnesses and other people). The defendant was represented by an attorney. In *People* v. *Mattson,* 51 Cal.2d 777 [336 P.2d 937] it was held that an accused is not entitled to have his case presented in court by both himself and counsel acting at the same time. (See *People* v. *Sharp, supra,* 7 Cal.3d 448, 459.)

### Alleged Misconduct by the Prosecutor

Defendant raises a number of contentions relating to the prosecutor's conduct.

In cross-examination the defendant stated he did not go out at night because of a head injury. The prosecutor asked him, "How did you receive the injury?" There was an objection by defense counsel and a request to approach the bench. At the bench, defense counsel indicated that the defendant's answer to the question would be that he sustained the injury in a prior shooting incident with a Highway Patrol officer. The prosecutor then stated he would withdraw the question. Defendant now argues that the prosecutor knowingly asked an improper question. Inasmuch as the question was withdrawn and the court properly instructed the jury at the conclusion of the case as follows: "As to any question to which an objection was sustained, you must not speculate as to what the answer might have been or as to the reason for the objection . . . A question is not evidence and may be considered only as it supplies meaning to the answer," any harmful effect from the question, if any, was obviated.

In cross-examination the defendant was asked whether he had any identification on him when he was arrested on October 9, 1969. He replied that he did not. There was no objection to the question by defense counsel. In his argument the prosecutor referred to the lack of identification and the giving of a false name to the police by the defendant on October 9, 1969, and implied that it indicated guilt and fearfulness of arrest for the homicide charged in this case. There was no objection to the argument by defense counsel. Defendant now argues that the prosecutor's remarks were improper because the prosecutor knew that the defendant had no

identification papers at the time of his arrest because the police had seized the identification papers at the time of the Highway Patrol shootout incident on September 9, 1969.

" 'Misconduct in argument may not be assigned on appeal if it was not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it.' " (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].)

In this proceeding there was no objection to the prosecutor's argument by defense counsel. Moreover, we do not believe that the prosecutor was guilty of misconduct in referring to the defendant's behavior on October 9, 1969. The reference to the lack of identification, which was in evidence, was only one aspect of that particular argument. Considering the fact that one month had elapsed since the incident on September 9, 1969, and the defendant had given a false name to the police on October 9, 1969, the remarks of the prosecutor were within permissible limits. Even if we assume that these remarks were improper and constituted error, it is not reasonably probable that a result more favorable to the defendant would have been reached in the absence of error. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The prosecutor asked witness Deputy Sheriff Silvas to describe the contents of a black plastic folder found in the automobile involved in the incident in which a Highway Patrol officer was' shot. One of the items mentioned by witness Silvas was the business card of Parole Agent S. Haskell. Upon the motion of defense counsel, the trial court struck the answer and admonished the jury to disregard it. The defendant attributes bad faith to the prosecutor in asking this question and contends that the reference to the business card of the parole agent was highly prejudicial.

The trial judge acted promptly in admonishing the jury. "It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have." (*Horn* v. *Atchison, T. & S. F. Ry. Co.,* 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561]; *Tingley* v. *Times Mirror,* 151 Cal. 1, 23 [89 P. 1097].) Considering the total circumstances herein, it is our view that any error in this area is nonprejudicial. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### Trial Judge's Comments on Burden of Proof

Prior to the *voir dire* examination of the prospective jurors, the trial judge made some preliminary remarks and undertook to explain the

concept of reasonable doubt. In explaining the burden of proof, the court stated: "It is the burden of proof in a criminal case, it is the burden of proof in this case to prove this case, if it is capable of that type of proof, beyond a reasonable doubt." At the conclusion of the guilt phase of the trial, the court gave the standard CALJIC instructions on reasonable doubt and burden of proof.[4]

Defendant contends that the trial judge's remarks had the effect of giving the jurors the distinct impression that they were to consider the evidence and determine whether or not the case could be proved beyond a reasonable doubt, and if they determined that it could not be proved beyond a reasonable doubt, then they could convict upon some lesser showing. Our review of the record does not indicate that such an inference is reasonable. The jury was fully and correctly instructed at the conclusion of the guilt phase of the trial. We do not believe that they could be confused because of the preliminary remarks of the court.

### Identification Testimony of Witness James Coleman

Defendant's pretrial Penal Code section 1538.5 motion to suppress witness Coleman's identification was denied by the trial court. At the 1538.5 hearing, Coleman testified that he was shown some photographs by officers prior to the preliminary hearing held on October 31, 1969. When they asked him if he could identify anybody, Coleman stated he told the officers "he'd rather not say." Coleman had seen the defendant in a courtroom prior to October 31, 1969. On this prior occasion, the defendant was seated at the counsel table. No officer pointed out the defendant to Coleman, but the defendant did stand up when his case was called. Coleman identified the defendant at the preliminary hearing on October 31, 1969. Coleman stated that his identification was not influenced in any way by what had happened in court prior to October 31, 1969,

---

[4]The instruction given by the court reads as follows:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.

"The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind."

and that he recognized the defendant from the night of the crime. At the trial, Coleman testified that when he was shown a group of photographs by the sheriff's deputies, he refused to pick out a photograph because he did not want to identify anyone by photograph but wanted to see the suspect in person. The group of photographs shown to Coleman included a photograph of the defendant. At the time he was shown the photographs, the officers did not tell Coleman which one was the defendant's photograph.

Defendant contends that he was entitled to have counsel present when Coleman was shown the photographs, that the photographic procedure utilized by the People was impermissibly suggestive, that Coleman's in-court identification was not free of the taint of pretrial suggestion, and that the in-court confrontation between defendant and Coleman was unconstitutionally suggestive.

In the light of the holdings in *People* v. *McInnis,* 6 Cal.3d 821, 826 [100 Cal.Rptr. 618, 494 P.2d 690] and *People* v. *Lawrence,* 4 Cal.3d 273, 279-280 [93 Cal.Rptr. 204, 481 P.2d 212], defendant was not entitled to have counsel present when the photographs were shown to Coleman.[5]

There is nothing in the record to indicate that the sheriff's deputies were using the photographs to "prime" Coleman. When Coleman was shown the photographs by the sheriff's deputies, they merely told him that they had a number of photographs and that they wanted him to look at them. They did not state that one of the photographs was a photograph of the defendant, nor did they point out defendant's photograph to Coleman. We find no evidence of undue suggestion.

There is ample evidence in the record to sustain the conclusion that Coleman's in-court identification of the defendant was based on his observations made during the early morning hours of September 29, 1969. Coleman testified that he recognized the defendant from that night and was sure of his identification. He stated that the fluorescent lights in the parking lot were turned on at the time he saw the right profile of the defendant.

We are cognizant of the problem posed to a defendant in a pending case when the matter is called and the defendant stands up in court in the presence of prospective witnesses. However, as the court noted in *People* v. *Bethea,* 18 Cal.App.3d 930 at page 938 [96 Cal.Rptr. 229]: "We recognize that every accused present at trial bears a burden and/or stigma of

---

[5]This question will be argued in the United States Supreme Court during the 1972-1973 term in the pending case of *United States* v. *Ash* (Docket No. 71-1255) 407 U.S. 909 [32 L.Ed.2d 682, 92 S.Ct. 2436] a matter involving a convicted Washington, D.C. bank robber.

the *allegation* of guilt by the very fact of his being on trial, but *Wade* and *Simmons* and their progeny do not extend to this aspect of the identification process."

### Motion to Suppress Fingerprint Exemplar

On October 8, 1969, as a result of their investigation in this case, the Los Angeles sheriff's office obtained an arrest warrant for the defendant. On October 9, 1969, the defendant was arrested by Los Angeles police officers on an unrelated charge. When he was taken into custody, the defendant said his name was Joe Burton. After his arrest, the defendant was fingerprinted and his true identity was ascertained. The sheriff was notified and the defendant was booked on the murder warrant. He was arraigned on this charge and a preliminary hearing date was set. On October 16, 1969, the sheriff's office took a set of defendant's fingerprints. From this set, a fingerprint exemplar was introduced in evidence at the preliminary hearing and at the trial. The fingerprints taken on October 9, 1969, were never utilized by the prosecution. At the pretrial Penal Code section 1538.5 hearing, defendant's motion to suppress the use of the October 16, 1969, fingerprint exemplar was denied. Defendant contends that his fingerprint exemplar was the tainted fruit of an illegal arrest on October 9, 1969, and that the trial court prejudicially erred in denying his motion to suppress this evidence.

If we assume, arguendo, that the defendant was illegally arrested on October 9, 1969, "[t]he appropriate question to be answered is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Krauss* v. *Superior Court,* 5 Cal.3d 418, 422-423 [96 Cal.Rptr. 455, 487 P.2d 1023] quoting *Wong Sun* v. *United States,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].)

In the case at bench, the defendant's arraignment on the arrest warrant for the murder charge broke any causal connection between the Los Angeles Police Department's arrest of October 9, 1969, and the sheriff's procurement of a fingerprint exemplar on October 16, 1969. There was no exploitation of any illegal activity. When the defendant's true identity became known, the sheriff had a right to book the defendant on the murder warrant. After the defendant's arraignment on the murder charge, the sheriff could properly procure a fingerprint exemplar from the defendant. (Cf. *People* v. *McInnis, supra,* 6 Cal.3d 821, 826; *People* v. *Carter,* 26 Cal.App.3d 862, 872 [103 Cal.Rptr. 327]; *Cornelius* v. *Superior Court,* 25 Cal.App.3d 581, 586 [102 Cal.Rptr. 59].)

## Use of a Manikin to Illustrate Medical Testimony

 Dr. Richard Phil, a pathologist who testified in behalf of the prosecution, illustrated his testimony by referring to a life-sized manikin made in the likeness of the decedent, Barge Miller. Defendant contends that this was unnecessarily prejudicial, was irrelevant and was inevitably inflammatory to the jury.

(20) Demonstrative evidence, even though it may have some prejudicial effect, is admissible as long as it " 'tends to prove a material issue or clarify the circumstances of the crime.' " (*People* v. *Robillard,* 55 Cal.2d 88, 99 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) The trial judge must determine whether the probative value of the proffered evidence outweighs any inflammatory effect. (*People* v. *Robles,* 2 Cal.3d 205, 214 [85 Cal.Rptr. 166, 466 P.2d 710].)

 We find no abuse of discretion in the trial court's order permitting use of the manikin. The record indicates that the decedent, Barge Miller, sustained seven separate wounds. The prosecution desired to demonstrate the position of the wounds in the victim's body to substantiate its theory that the case involved an execution. In the instant case, the manikin aided the jury in understanding the pathologist's technical description of the wounds. As the court stated in *People* v. *Robillard, supra,* 55 Cal.2d 88, 99, "The use of a dummy under such circumstances in a homicide case to show the type and placement of the wounds received by the victim is proper."

The judgment is modified to provide for the punishment of life imprisonment instead of death. As modified, the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 8, 1973.