[Crim. No. 16844. First Dist., Div. Four. Apr. 5, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
WENDY MASAKO YOSHIMURA, Defendant and Appellant.

610

612

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, B. E. Bergesen III, Robert P. Mason and Dennis P. Riordan, Deputy State Public Defenders, Larson & Weinberg and James Larson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RATTIGAN, J.**—A jury found appellant Wendy Masako Yoshimura guilty of unlawful possession of explosives, of a machine gun, and of substances and materials with the intent to make destructive devices and explosives. She appeals from the judgment of conviction.

*Appellant and three codefendants (William Brandt, Michael Bortin and Paul Rubenstein) were initially accused of these crimes in a four-count indictment returned by the Alameda County Grand Jury in 1972.* They were jointly charged in count one with possession of explosives on March 30, 1972, in violation of Health and Safety Code section 12305; in count two, with possession of a machine gun on that date in violation of Penal Code section 12220; in count three, with possession on that date of "a substance, material, and combination" of both, with the intent to make destructive devices and explosives, in violation of Penal Code section 12312; and in count four with possession on that date of destructive devices and explosives, "with the intent to injure, intimidate and terrify persons . . . and to wrongfully injure and destroy any property," in violation of Penal Code section 12303.3.[1]

The articles charged in the indictment were discovered in Berkeley on March 30, 1972. The indictment was returned on April 12, 1972. Brandt, Bortin and Rubenstein had been arrested when the articles were discovered. Each promptly entered a plea of guilty to one count (Brandt to count three, Bortin and Rubenstein to count one), and the remaining

---

[1] The passages quoted in this text appeared in the indictment. The four statutes involved are quoted below, and some related statutes are cited, as they read on March 30, 1972.

Health and Safety Code section 12305 (count one) provided: "Every person not in the lawful possession of an explosive who knowingly has any explosive in his possession is guilty of a felony." The term "explosives" was defined in Health and Safety Code section 12000.

Penal Code section 12220 (count two) provided: "Any person . . . who within this State . . . possesses . . . any firearms of the kind commonly known as a machine gun, except as provided by this chapter, is guilty of a public offense . . . ." The term "machinegun" (*sic*) was defined in Penal Code section 12200.

Penal Code section 12312 (count three) provided: "Every person who possesses any substance, material, or any combination of substances or materials, with the intent to make any destructive device or any explosive without first obtaining a valid permit to make such destructive device or explosive, is guilty of a felony . . . ." The term "destructive device" was expressly defined in Penal Code section 12301, subdivision (a). Subdivision (b) of that section also incorporated the definition of the term "explosive" which appeared in Health and Safety Code section 12000.

Penal Code section 12303.3 (count four) provided: "Every person who possesses . . . any destructive device or any explosive with intent to injure, intimidate, or terrify any person, or with intent to wrongfully injure or destroy any property, is guilty of a felony . . . ."

charges against them were dismissed. As will be described in further detail, appellant fled the jurisdiction and remained a fugitive until she was arrested and returned to Alameda County in September of 1975.

Extensive pretrial and other proceedings followed, in the trial court and in this court. (See *People* v. *Superior Court (Yoshimura)* (1976) 62 Cal.App.3d 410 [133 Cal.Rptr. 228].) The jury trial commenced in 1976, lasted for 49 trial days, and concluded in 1977. The jury found appellant guilty as charged in the first three counts, but was unable to reach a verdict on count four. The trial court declared a mistrial on that count, denied appellant's motion for a new trial on counts one, two and three, and sentenced her to state prison for the terms prescribed by law. This appeal followed.

### The People's Evidence

The prosecution evidence covered a time span which commenced three years before March 30, 1972. Viewed in the light most favorable to the People, it supports the following recitals:

Appellant lawfully purchased a 12-gauge Mossberg shotgun in September 1969, and a .30-caliber M-1 carbine in September 1970. She used her true name on each occasion. After mid-1970, she drove an old Volkswagen registered in the name of her father. In 1971 and until March 30, 1972, she worked as a free-lance artist in the employ of a public relations agency in Oakland. In 1971, her residence address was recorded at the agency as 691 Fairview Street in Oakland.

In May of 1971, she rented an apartment at another Oakland address under the false name of "Gwen James." Using that name, she lived there with the codefendant Brandt from January through March 1972. Brandt was then carrying a driver's license issued to him under the false name of "William Baker."

In 1971, Michael Grabianowski was the manager of an apartment complex located near the university campus in Berkeley. In August of that year, he leased an automobile garage in the complex (garage No. 3) to appellant. She used the name "Anne Wong" on that occasion. Grabianowski leased the garage to her from August 3, 1971, to January 1, 1972. The rental agreement included a combination lock on the garage door, provided by the owner of the apartment complex.

Grabianowski did not see appellant again until January 1, 1972, when she returned and renewed the lease for another six months. He had meanwhile noticed that the combination on the garage lock had been changed, and called this to her attention. She promised to restore the original combination before her lease expired.

On March 30, 1972, Grabianowski saw that an old Volkswagen was parked at garage No. 3, that the garage door was open, and that a young man was inside. At his request, the man agreed to change the lock back to its original combination. Later that day, a tenant in the apartment complex told Grabianowski that he smelled gas. Grabianowski traced the odor to the vicinity of garage No. 3, but was unable to open the lock by using the owner's combination. He then broke into the garage, where he saw chemicals, various containers, and pieces of pipe. He immediately called the Berkeley Police Department.

Police Inspector Michael O'Keefe and Bomb Disposal Technician Michael Drucquer responded to the call and entered the garage. Drucquer immediately observed what appeared to be a live bomb cased in a 14-inch length of grooved pipe, an array of similar devices in various stages of assembly, and numerous firearms. O'Keefe then had Grabianowski evacuate the tenants from the apartment complex, obtained a warrant authorizing a search of the garage, and inventoried a huge collection of articles found in it.

At about midnight on March 30, Drucquer and other officers were able to remove the grooved pipe bomb from the garage at the end of a 150-foot line. They took it to Edwards Field (a stadium on the nearby university campus), covered it with sandbags, and exploded it with a shotgun blast fired from a remote-controlled mount. It made a "loud detonation, a lot of smoke," and blew a crater into the ground. The grooved pipe casing "took off like a rocket," and was retrieved somewhere in Edwards Field. Dracquer testified that it had been grooved to provide "[e]nhanced fragmentation."

Weapons found in the garage[2] included the M-1 carbine appellant had bought in 1970, a 12-gauge Mossberg shotgun similar to the one she had purchased in 1969, and at least six other firearms. The officers also found a Chinese model of a Russian AK 47 submachine gun, which was capable of full automatic operation and was test-fired as an automatic weapon by

[2]The police inventory of all the articles removed filled 31 pages of a return made on the search warrant. We describe some of them because of their obvious pertinence to the charges made in the indictment.

police experts.[3] Large amounts of live ammunition, some expended shell casings, and a scale for reloading them, were found with the firearms. Some of the expended casings had been fired from appellant's M-1 carbine. Rubenstein's fingerprints were found on the reloading scale.

The officers also found quantities of explosives and component materials, such as ammonium nitrate; "anfo," an explosive compound which had been used in a 1972 bombing in Oakland; picric acid; concentrated sulphuric acid; potassium chlorate; time bomb components (e.g., blasting caps, lengths of pipe, batteries, an alarm clock and assorted explosive agents); and apparently innocuous items such as beer cans, one of which had been partially fashioned into a lethal device known as a "People's Hand Grenade."[4]

An array of documents found in the garage included manuals on "urban guerilla warfare" apparently published by underground sources, and military books and publications on weapons and explosives. Appellant's, Brandt's, and Rubenstein's fingerprints were on some of these documents. The officers also found catalogs and lists of publications on firearms, explosives, guerilla warfare and demolition, including information on the AK 47 machine gun previously described. (See the text at fn. 3, *ante.*) These documents had been mailed to "A. Chang" at 691 Fairview Street (appellant's residence address in 1971). A postcard was found which had been sent to Arwell Industries, requesting that firm's catalog, and returned by the post office to "A. Chang" at the Fairview Street address. Appellant's and Brandt's fingerprints were on the card.

Various other documents found by the officers included birth certificate information; identifying cards and papers issued in several names;[5] a written statement claiming credit for having "attacked the Space Sciences Laboratory"; and miscellaneous documents bearing appellant's and Brandt's fingerprints. The officers also found artist's materials and prints apparently signed by "W. Yoshimura" as the artist. One more collection of items found, and received in evidence as People's exhibit 99, will be described later.

---

[3] It is undisputed that this weapon is a "machine gun" within the meaning of count two of the indictment. (See Pen. Code, § 12200.)

[4] It is undisputed that this catalog included "explosives" within the meaning of count one of the indictment and ingredient "substances and materials" within the meaning of count three. (See Health & Saf. Code, §§ 12305, 12000; Pen. Code, §§ 12312, 12301, subd. (a).)

[5] These names were James C. Smith, Dean A. Darnell, Jeannette Wahwahsuck, K. Peterson, Kathleen Peterson, Harlow B. Olsen and Susanne L. Dyckman. Another document found by the officers was a list of many more names filling four pages.

After the officers had secured the garage during the night of March 30-31, they locked the door and kept the premises under surveillance. At about 3 a.m., Brandt, Bortin and Rubenstein drove up in appellant's Volkswagen and entered the garage. The officers ordered them out and placed them under arrest. Bortin and Rubenstein gave their true names, but Brandt identified himself as "Barrows." It was then established that the three had dropped loaded firearms, gloves, a watchcap, a flashlight, and matches inside the garage. Officers found in the Volkswagen a driver's license in the name of "William Harvey Baker" and two copies of a "communique" claiming credit for having "torched" a specified building.[6] Brandt's fingerprints were on one of the copies.

Police officers were unable to find appellant on and after the next day. She was last seen in Oakland on April 1, 1972. Her whereabouts during the next three years will also be described later.

*Defense Evidence*

Appellant took the stand in her defense, and testified at length until the prosecutor began asking her to name various persons with whom she had been involved on and after March 31, 1972. She declined to name anyone on the basis—read to the jury in a prepared statement—that the Japanese concepts of "On" (obligation) and "Giri" (responsibility) obligated her not to "harm" people who had helped her. When the prosecutor persisted, she expressly disclaimed a Fifth Amendment privilege but refused to give any names. After she had been cited for contempt several times, the trial court struck her testimony in its entirety. The contempt proceedings were later dropped, but the case went to the jury without any of her testimony. Three other defense witnesses gave testimony generally favorable to her character, but none of it pertained to the principal features of the People's evidence against her.

---

[6]The document stated: "Communique from the Revolutionary Army. We torched the Naval Architecture Building in accordance with the verdict of the War Crimes Tribunal linking it to the Department of Defense. Any stage in the production of the empire's death machine is a legitimate target of revolutionary war, including the training school for the technicians of death. To live is to take sides, means [sic] as long as we leave [sic] there will be war without end against Babylon until final victory." This garbled proclamation is to be read in light of the hour and the evidence of the articles left in the garage before the three men were arrested. The combination unmistakably supports the inference that the Naval Architecture Building was to be "torched" that night.

REVIEW

The People's evidence was introduced and submitted to the jury on the theories that appellant was guilty of possession, on each of the four counts, as a principal or as an aider and abettor; and she and the codefendants had engaged in an uncharged conspiracy pertinent to the possession charged in each count. Without reference to the element of conspiracy at this point, we first state that the evidence clearly supports the inferences that she was in actual or constructive possession of the articles charged in the three counts under which she stands convicted; that it also shows that she had knowledge of the nature and character of the articles; and that it accordingly supports her convictions in these respects.[7] (See *People* v. *Redrick* (1961) 55 Cal.2d 282, 285-288 [10 Cal.Rptr. 823, 359 P.2d 255] and cases there cited; 2 Witkin, Cal. Crimes (1963) §§ 689-692, 774, 779-780.)

Appellant virtually concedes this, but claims reversible error with regard to (1) the admission of a mass of evidence linking her with a notorious group of fellow fugitives from justice, principally one Patricia Hearst; (2) evidence of the existence or nonexistence of any "valid permit" authorizing evidence of the articles found in the garage; (3) the admission in evidence of the aforementioned People's exhibit 99; and (4) an instruction given by the trial court on the subject of reasonable doubt. She also claims (5) prejudicial misconduct by the prosecutor and (6) sentencing error.

For the reasons stated below in sequence, none of these contentions can be sustained. We affirm the judgment of conviction.

(1) ■ *Appellant's Association With Patricia Hearst and Company*

This association was brought to light when appellant was arrested by FBI agents on September 18, 1975, in San Francisco. She was living in an apartment with Hearst, who was arrested with her. FBI agents arrested William and Emily Harris in San Francisco on the same day. The arrests climaxed a sequence of world-renowned events which had involved Hearst, the Harrises, one Stephen Soliah, and several other persons, all of whom called themselves the Symbionese Liberation Army (hereinafter SLA).

[7]We also express the view that the evidence to this effect is overwhelming.

In consequence of some of these events, Hearst and the Harrises had been avoiding arrest on serious criminal charges since the spring of 1974. When they were arrested in San Francisco on September 18, 1975, they were the most notorious fugitives in the nation. Their notoriety continued in the subsequent months, during which Hearst was tried and convicted on criminal charges before appellant was. The principal episodes of this total sequence are within common knowledge of household-word dimensions, but they bear recital because of their pertinence to appellant's claim of trial error. A recital appears in the margin, based upon evidence which permeates and overflows the full record made in the trial court.[8]

Commencing with a "Motion In Limine" made and renewed before her trial, appellant sought an order excluding any evidence relative to the SLA, Hearst, the Harrises, Stephen Soliah, and other persons characterized as "members or sympathizers" of the SLA. The court denied that motion at the commencement of trial, and denied related motions for a mistrial later, on the general basis that such evidence was admissible to the extent that it tended to explain appellant's three-year "flight" from

---

[8]Hearst herself is a young member of a nationally prominent family of great wealth, and is reputedly an heiress to its fortune. The sequence involving her commenced on February 4, 1974, when she was forcibly abducted from her Berkeley apartment by the Harrises and other members of the SLA.

The SLA had previously attracted some public attention as the result of the 1973 murder of Marcus Foster, a well-known Oakland school official, and when two of its members were arrested for the murder after a shootout with police in January 1974. The SLA became world-famous when it claimed credit for the Hearst kidnaping in February, and when she confirmed this in some celebrated tape recordings which were played and reproduced in the news media. The SLA demanded ransom in the form of a "food for the poor" program which her family promptly established. It then released some even more celebrated tapes in which Hearst proclaimed her "conversion" to the SLA and renounced her family.

On April 15, 1974, Hearst and various SLA members robbed a San Francisco bank at gunpoint. A month later, several SLA members were killed in a spectacular shootout with Los Angeles police. Hearst and the Harrises escaped that episode, but on the preceding day Hearst had sprayed a Los Angeles sporting goods store with automatic-weapon fire in a successful attempt to liberate one of the Harrises, or both, from detention for a trivial shoplifting.

Hearst and the Harrises remained at large from various criminal charges for the next 16 months, during which the FBI discovered that they had occupied a Pennsylvania farmhouse in 1974. The agency later discovered that the Harrises had been living in an apartment in Sacramento, a fact which tended to implicate them and Stephen Soliah in a bank robbery-murder committed near that city in April of 1975. Hearst and the Harrises continued to elude capture until the FBI arrested them and appellant in San Francisco on September 18, 1975.

Hearst was subsequently tried and convicted of the 1974 bank robbery. Stephen Soliah was tried and acquitted on charges involving the 1975 robbery-murder in the Sacramento area. Both trials were conducted before appellant's trial commenced in the fall of 1976.

The news media gave saturation coverage to these events on a day-to-day basis, particularly after the San Francisco arrests.

arrest on the indictment. Defense counsel twice offered an explicit stipulation regarding her "flight."[9] The prosecutor rejected the offer on both occasions. After the second rejection, and over a continuing defense objection, the People introduced evidence which (1) implicated appellant with Hearst, the Harrises, and the SLA prior to the 1975 arrests and (2) described appellant's arrest with Hearst and various articles in their possession at that time.

The prearrest proof included lurid descriptions of Hearst's participation in the San Francisco bank robbery, and the incident in which she had shot up the Los Angeles sporting goods store, in the spring of 1974. (See fn. 8, *ante.*) There was no evidence that appellant had been involved in these episodes in any way. Fingerprint and other evidence established that Hearst and the Harrises had occupied the Pennsylvania farmhouse later in 1974. (See *ibid.*) It was also shown that appellant's fingerprints had been found there. There was evidence that Emily Harris, using a false name, had rented the Sacramento apartment in late 1974 and occupied it until June 1, 1975. (See *ibid.*) It was shown that appellant's fingerprints were later found there with the prints of both Harrises.

The evidence of appellant's arrest with Hearst showed that they were in possession of two carbines and a shotgun at the time. A handgun, ammunition, and a New Jersey driver's license issued to appellant under another false name ("Joan Shimada") were found in her purse. She also had a birth certificate identifying one Mignon Wong, a real person who had been born in 1940 but died in the same year. The arresting officers found a book ("Explosives and Homemade Bombs") which was identical to one found in the Berkeley garage in 1972. A document bearing the name "Stephen F. Soliah," and the fingerprints of both Harrises, were also found in the San Francisco apartment. A letter in appellant's handwriting, which she apparently had been writing when she was arrested, was received in evidence.[10]

---

[9]On the first occasion, counsel stated that "[t]he defense offers the stipulation to the following effect: that Wendy Yoshimura fled the jurisdiction of the Superior Court of Alameda County and the State of California in April of 1972 to avoid prosecution for the offenses charged in this indictment. She continued to avoid prosecution until the time of her arrest in September of 1975 and during that time she associated with other fugitives attempting to avoid prosecution for other charged offenses."

[10]This letter was addressed to "Dearest Brother." It included these passages among others: ". . . [T]he group has literally ceased to be a group. . . . Ever since the group came together . . . a little over a year ago, we've had a very trying time. . . . Finally at one point we seemed to have found a middle ground and it looked as though we were beginning to co-ordinate and work together. We finally were able even to do a couple of actions. . . . After that there were series [*sic*] of incidents that took place which only

The trial court instructed the jury that this evidence had been admitted (1) because of its relevance to show whether or not appellant's "flight" in 1972 was motivated by her "consciousness of guilt" of the crimes then charged and (2) because some of it was deemed relevant to show her knowledge of the nature of various articles found in the Berkeley garage in 1972.[11] Appellant principally challenges the first reason, contending that any evidence tending to explain her "flight" was foreclosed by her offer to stipulate on that subject. (See fn. 9, *ante.*) She also asserts that the effect of this evidence was so prejudicial, in establishing "guilt by association" with Hearst and the Harrises and "other crimes" committed by her or imputed to her, that its admission operated as an abuse of discretion which denied her due process of law.

Appellant's principal argument is based on decisions to the effect that a defendant's offer to stipulate to a relevant fact precludes the admission of any prejudicial evidence tending to prove it. (*People* v. *Guzman* (1975) 47 Cal.App.3d 380, 389-390 [121 Cal.Rptr. 69]; *People* v. *Gonzales* (1968) 262 Cal.App.2d 286, 288-291 [68 Cal.Rptr. 578].) The defendant in one of these cases offered to stipulate to a fact which supported the inference that he had a motive to commit the robbery charged. (*People* v. *Guzman, supra,* at p. 389.) In the other, a prosecution for possession of marijuana, the defendant offered to stipulate that he knew the narcotic nature of the substance. (*People* v. *Gonzales, supra,* at p. 290.) Each of these facts supported only one inference which tended to show guilt, and neither fact was vulnerable to an opposing inference being drawn from evidence which the defendant might have offered to show that it was consistent with his innocence.

In contrast, the fact of *flight* by an accused may support opposing inferences to be drawn from evidence of its circumstances. The fact "may" support the inference that he fled in "consciousness of guilt," and

made it very clear to . . . P.H. and me that we wanted no part of it . . . after working with them. . . . Their attitudes around arm [*sic*] struggle is that it only is a valid [*sic*] and anything else (above ground. etc.) is irrelevant. . . . I truly feel that what motivated them to take on an arm [*sic*] action is very different from what motivated me and the others. . . . I tell you, this is an experience I'll never forget! It was horrendous but at the same time I've learned a hell of a lot. Now I understand more clearly of my political views. and . . . the sense of myself I've gotten out of this ordeal—I wouldn't exchange it for anything! . . ." The full context of this letter identifies "them" as William and Emily Harris.

[11] The instructions cited here are too long to quote. but it may be stated that the trial court painstakingly worded them to limit the jury's consideration of this evidence to the two purposes mentioned. They also repeated the substance of similar admonitions the court had given the jury earlier in the trial.

it has "no other probative value" when it is shown by the prosecution. (*People* v. *Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586].) The courts have nevertheless recognized that the accused may explain his flight with evidence attributing it to a motive compatible with his innocence. (Cf. *Wong Sun* v. *United States* (1963) 371 U.S. 471, 483 [9 L.Ed.2d 441, 483-484, 83 S.Ct. 407], fn. 10 [quoting *Alberty* v. *United States* (1896) 162 U.S. 499, 511 (40 L.Ed. 1051, 1056, 16 S.Ct. 864)]; *People* v. *Duran* (1976) 16 Cal.3d 282, 293-295 [127 Cal.Rptr. 618, 545 P.2d 1322]; *People* v. *Guzman, supra,* 47 Cal.App.3d 380 at p. 388.) The Legislature has also recognized this by providing in Penal Code section 1127c that the fact of flight "may" be considered in deciding the issue of guilt but is not conclusive, and that the jury must be so instructed.[12] A defense offer to stipulate to the *fact* of flight will thus leave open—and subject to proof—the prospect of opposing inferences as to whether the motive for the flight was "consciousness of guilt" or a reason consistent with innocence. The prospect distinguishes the decisions cited by appellant, in which the defense offers to stipulate did not permit such opposing inferences. (*People* v. *Guzman, supra,* at p. 389; *People* v. *Gonzales, supra,* 262 Cal.App.2d 286, 288-291.)

Defense counsel expressly offered to stipulate that in 1972 appellant had "fled . . . to avoid prosecution for the offenses charged in this indictment." (See fn. 9, *ante.*) This artful language, if accepted by stipulation, would have established the *fact* of flight *and* that the inference of "consciousness of guilt" could not be drawn from it. So long as that inference remained logically possible (which it clearly did), the offer to stipulate did not foreclose the People from exploiting it or from introducing evidence in support of it. We have seen that the rule applied in *Guzman* and *Gonzales* did not command these results because the offers in both cases were distinguishable. The rule controlling here is based on the "strong policy against depriving the state's case of its persuasiveness and forcefulness by forcing the prosecutor to accept

---

[12] Penal Code section 1127c states: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court *shall* instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is *not sufficient in itself to establish his guilt,* but is a fact which, if proved, the jury *may* consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (Italics added.)

On the subject of appellant's "flight" as such, the trial court complied with the statute by instructing in language explicitly approved by the Supreme Court for that purpose. (*People* v. *Hill, supra,* 67 Cal.2d 105 at pp. 119-121 and fn. 9; see also *People* v. *Guzman, supra,* 47 Cal.App.3d 380 at p. 388.)

stipulations that soften the impact of the evidence in its entirety." (*People* v. *McClellan* (1969) 71 Cal.2d 793, 802 [80 Cal.Rptr. 31, 457 P.2d 871]. Cf. *People* v. *Robles* (1970) 2 Cal.3d 205. 213 [85 Cal.Rptr. 166, 466 P.2d 710]; *People* v. *Pollock* (1938) 25 Cal.App.2d 440, 444 [77 P.2d 885].) The admission of the challenged evidence was not erroneous by reason of the offer to stipulate.

The companion question is whether its admission was an abuse of discretion producing the prejudicial effect of which appellant complains. The assessment of this prospect required the trial court to weigh its probative value against its prejudicial effect. (Evid. Code, § 352.) Its probative value was to be measured in terms of the issues on which it was admitted: appellant's knowledge of the nature of the articles found in the Berkeley garage in 1972 and the question whether she had taken flight in "consciousness of guilt" or for a reason compatible with innocence. Some of the evidence in question was probative on both issues (e.g., the book on "Explosives and Homemade Bombs"). Proof of her possession of firearms in 1975 was only cumulative on the knowledge issue, because her familiarity with firearms had been substantially shown by the evidence that she had personally bought a carbine in 1969 and a shotgun in 1970.

However, the fact that she was armed in 1975 was relevant to dispel any inference that her flight in 1972 had been motivated by some reason *other than* "consciousness of guilt" at that time.[13] The false identification in her possession had the same effect. So did the language of the letter she was writing when she was arrested, which strongly tended to show that her flight had permitted her to join in "a couple of actions" since 1974, that they were "arm[ed] actions" similar to those she had inferably

---

[13]The relevance of this fact, and others, was also developed by the context in which the prosecutor proved them. He had dwelt on appellant's flight in 1972, and her subsequent association with Hearst and company, in his opening statement to the jury. This tactic was consistent with the trial court's previous ruling that evidence of the Hearst association was admissible on the issue of flight. Defense counsel, confronted with the same ruling and responding to the prosecutor, addressed the same subjects in his opening statement. He told the jury that the "evidence will show" that appellant had fled in 1972 "knowing that she was innocent but fearing," for stated reasons, "that she could not receive justice if she remained in the Bay Area." Counsel similarly portended defense evidence which would "show" that she had accidentally fallen in with Hearst and the Harrises in 1974, and that she had become a kind of caretaker-companion of Hearst because she (appellant) "is a warm, open, compassionate . . . person" and Hearst needed her.

Any testimony later given by appellant in support of these statements went out when all her testimony was stricken. but that was not anticipated when her attorney addressed the jury in his opening statement. The trial court's rulings on the challenged evidence were thus made in full anticipation that defense evidence would be coming in to show that her flight had not been motivated by "consciousness of guilt" and that her subsequent association with Hearst and company was essentially innocent. So long as that

contemplated or taken in 1972, and that she had longstanding convictions which "motivated" her to take them. (See fn. 10, *ante.*) No abuse of discretion appears in the admission of this evidence as such.

The claim of prejudicial abuse of discretion ultimately goes to the full panoply of evidence involving appellant with Hearst (and with the Harrises, and Soliah, and others associated with the SLA) because of who these people were and what they had done before appellant joined them. The damaging potential of this evidence was not to be overlooked, but we find no abuse of discretion and no prejudice. Some of the evidence was both relevant and necessary as a foundation for the proof which was admissible for its pertinence to appellant's anticipated explanation of her three-year "flight" from justice. Whatever was left involved only the concept of "guilt by association" with notorious names and crimes, but its totality told the jurors nothing they did not already know. This is made abundantly clear in the voir dire interrogation of all 12 of them, and the trial judge was aware of their answers when he admitted the evidence under review.[14] Its probative value was not to be outweighed by its minimal potential for prejudice. No occasion for reversal appears. This conclusion refutes appellant's claim that she was denied due process.

(2) ■ *The "Valid Permit" Issue*

Appellant challenges her convictions under counts one, two and three on the basis of statutory schemes pursuant to which possession of the articles charged in these counts could have been lawful if it had been

prospect persisted throughout the presentation of the People's case, the challenged evidence was highly relevant to refute it.

[14]The detailed voir dire interrogation of the 12 jurors who finally sat in the case fills most of three transcript volumes. Without exception, all 12 of them had heard of appellant through the news media. For some reason, one of them was asked virtually nothing else. Among the other 11, all knew that appellant had been arrested with Hearst. Each of the 11 who was asked knew (and some volunteered knowing) who Hearst, the Harrises, and Stephen Soliah were: what the SLA was: about the 1973 murder of Marcus Foster and its aftermath: that Hearst had been kidnaped: about the "food for the poor" program demanded as ransom by the SLA: that there was a basis for associating appellant with the SLA, principally through Hearst: that Hearst had participated in the 1974 bank robbery in San Francisco: that several SLA members had been killed in the shootout with Los Angeles police: that Hearst had sprayed the sporting goods store with gunfire at about the same time: that the FBI had later crossed her and the Harrises' trail at the Pennsylvania farmhouse: and that the trail of some of them had been crossed again in Sacramento, which identified them with the 1975 robbery-murder committed in that vicinity. Each of these eleven prospective jurors were not asked about each subject mentioned, but collective awareness of all of them was clearly established: with one or two insignificant exceptions, none professed ignorance of any of the features of the long history previously recited. (See fn. 8, *ante.*)

authorized by a valid permit issued by competent public authority and recorded with the state Department of Justice.[15]

The People introduced no evidence that appellant or any of the indicted codefendants *lacked* any such permit. Although appellant made no effort to show the existence of one pertinent to any of the three counts, she requested an instruction on each which (1) defined the *lack* of a permit as an essential element of the respective crime and (2) assigned to the People the burden of proving it, with the other elements, beyond a reasonable doubt. The trial court refused these instructions on the theory that the existence of a valid permit was an "affirmative defense" on which appellant bore the burden of proof.

Appellant now contends that the absence of evidence of the *lack* of a permit is a fatal failure in the proof of her guilt on counts one, two and three, and that the court committed reversible error in refusing the requested instructions. The Attorney General concedes that "the existence of a license [i.e., of a valid permit] is a complete defense to the charge" made in each count, but defends the trial court's refusal of the instructions by arguing that "the burden of proving such license is properly on the defendant." The question is thus narrowed to whether the court erred in refusing the instructions.

The court's action was predicated on the so-called "rule of convenience." (*People* v. *Osaki* (1930) 209 Cal. 169, 176-193 [286 P. 1025]; *People* v. *Flores* (1976) 62 Cal.App.3d Supp. 19, 22-23 [133 Cal.Rptr. 759]), or "rule of necessity and convenience." (*People* v. *Montalvo* (1971) 4 Cal.3d 328, 334 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518].) The rule has

---

[15]A separate "permit" scheme attends each of the three statutes under which appellant stands convicted. (Health & Saf. Code, § 12305: Pen. Code, § 12220; Pen. Code, § 12312.) The details of each, and the features peculiar to it, preclude its analysis except as follows: According to the pertinent statutes as they read on March 30, 1972 (see fn. 1, *ante*), (1) possession of the "explosives" proscribed by Health and Safety Code section 12305 was unlawful *unless* it were pursuant to a "permit" recorded at the Bureau of Criminal Identification and Investigation (see Health & Saf. Code, §§ 12303, 12101, subds. (a)(3) and (b), 12007, 12105.2); (2) possession of a machine gun proscribed by Penal Code section 12220 was unlawful "except" where it was authorized by a permit issued by the "Chief" of that bureau (see Pen. Code, § 12230); and (3) possession of the substances and materials proscribed by Penal Code section 12312 was unlawful "without . . . a valid permit to make" a destructive device, or an explosive, issued by the same official (see Pen. Code, § 12312 as quoted in fn. 1, *ante*; Pen. Code, § 12305) or issued locally and recorded at his office. (See Pen. Code, § 12301, subd. (b); Health & Saf. Code, §§ 12101, subds. (a)(1) and (b), 12007, 12103, 12105.2). The Bureau of Criminal Identification and Investigation was a component agency of the Department of Justice in 1972. (See Gov. Code, § 15001.)

emerged from a long line of decisions which operate to impose on a defendant the burden of proving an exonerating fact if its existence is "peculiarly" within his personal knowledge and proof of its *non*existence, by the prosecution, would be relatively difficult or inconvenient. (*People v. Boo Doo Hong* (1898) 122 Cal. 606, 608-609 [55 P. 402] [license to practice medicine]; *People v. Fortch* (1910) 13 Cal.App. 770, 775 [110 P. 823] [license to practice dentistry]; *People v. Osaki, supra,* at p. 182 [citizenship by birth]; *People v. Marschalk* (1962) 206 Cal.App.2d 346, 349-350 [23 Cal.Rptr. 743] [prescription authorizing possession of narcotics]; *People v. Flores, supra,* at pp. 21-23 [license to do business as a carrier].)

The *Montalvo* decision (*People v. Montalvo, supra,* 4 Cal.3d 328) defines the rule and draws some distinctions which currently control its application in a manner consistent with the overriding requirement that the prosecution bears the burden of proving guilt beyond a reasonable doubt. The defendant in *Montalvo* was tried on a charge of having violated a statute (Health & Saf. Code, § 11502) which provided that "[e]very person of the age of 21 years or over" who furnished certain narcotics to a minor was guilty of a felony.[16] (*People v. Montalvo, supra,* at p. 330.) A jury found him guilty although neither side introduced any evidence of his age and the jury was not instructed on the subject. (*Id.,* at p. 332.) The Supreme Court reversed the judgment of conviction, stating in pertinent part:

"Section 11502 provides that every 'person of the age of 21 years or over' who commits any of the proscribed acts is guilty of a criminal offense. *There is nothing whatever in that language to suggest that majority is not an element of the crime that the prosecution must prove or that minority is a defense that the defendant must assert.* The Legislature is fully cognizant of the rules placing on the prosecution the burden of proving every element of the offense charged and guaranteeing the defendant a jury trial on every such element regardless of the state of the evidence. [Citations] *When it has seen fit,* the Legislature has responded to those rules by providing that certain facts constitute defenses that the defendant must either invoke by some evidence or, in some cases, prove by a preponderance of the evidence. It has also assisted the prosecution by

---

[16]Health and Safety Code section 11502 then provided in pertinent part: "Every person of the age of 21 years or over who . . . unlawfully sells, furnishes, administers, [or] gives . . . any narcotic other than marijuana to a minor shall be punished by imprisonment in the state prison. . . ." (See its text as quoted in *People v. Montalvo, supra,* at p. 332, fn. 1.) It has since been repealed and reenacted, in modified form and under another number. (See Health & Saf. Code, § 11353.)

creating presumptions in proper cases. Had it intended that the prosecution should not have the normal burden of proving the defendant's majority in section 11502 prosecutions, it is only reasonable to assume that the Legislature would have in one way or another so provided.

"The Attorney General contends, however, that the burden of raising the issue of defendant's age may properly be placed upon defendant under *the rule of necessity and convenience.* Under that rule, despite the state's burden of proof beyond a reasonable doubt of all material elements of the offense (Pen. Code, § 1096), if the charge contains a negative averment *or concerns a fact peculiarly within the knowledge of the accused,* the initial burden of producing evidence on that issue may be placed upon the accused where he has *more ready access to that proof and subjecting him to this burden will not be unduly harsh or unfair." (People* v. *Montalvo, supra,* 4 Cal.3d 328 at pp. 333-334 [italics added; fn. omitted].)

Appellant interprets *Montalvo* as permitting the rule of convenience to apply only if the Legislature has expressly provided this by statute, as it has done in Health and Safety Code section 11550.[17] The *Montalvo* court reached the equivalent of that conclusion upon analysis of former Health and Safety Code section 11502, but only because the statute defined a crime in terms of a combination of (1) the majority of the actor *and* (2) his commission of the acts proscribed. (See fn. 17, *ante; People* v. *Montalvo, supra,* 4 Cal.3d 328 at pp. 332-333.) It was the parity in that combination which did not "suggest" a legislative intent that one charged with a violation should bear the burden of disproving either element. (*Id.,* at p. 333.) No such parity appears in any of the three statutes involved here, because each defines a single act as a crime *unless* there is a permit authorizing it as provided in the respective statutory context. (See fns. 1 and 15, *ante.*)

The Legislature's express application of the rule of convenience in prosecutions for violations of Health and Safety Code section 11550 (see fn. 17, *ante*) is no more than an isolated illustration of its having assigned a burden of proof to a defendant, consistent with the constitutional and

---

[17]Health and Safety Code section 11550 provides in pertinent part: "No person shall use, or be under the influence of any controlled substance which is (1) specified . . . [in cited sections of the code] . . . or (2) which is a narcotic drug classified in Schedule III, IV, or V, excepting when administered by or under the direction of a person licensed by the state to dispense, prescribe, or administer controlled substances. *It shall be the burden of the defense to show that it comes within the exception.* Any person convicted of violating any provision of this section is guilty of a misdemeanor . . . ." (Italics added.) Appellant cites no other statute containing the emphasized provision or its equivalent, and we are aware of none.

statutory allocation of the essential burden of proof to the prosecution, "[w]hen it has seen fit." (*People v. Montalvo, supra,* 4 Cal.3d 328 at p. 333.) The fact that it has done so in other instances provides similar illustrations, but it has not been interpreted as abrogating the rule of convenience in all cases: the *Montalvo* court established this by discussing the fact and the rule together. (*Id.,* at pp. 333-334 and fn. 3.)

The rule was therefore to be applied here if the circumstances warranted it. Appellant disputes this by arguing that the People could readily have proved the *lack* of a "valid permit" by proving that none was recorded in her name, or the name of any indicted codefendant, at the Department of Justice. (See fn. 15, *ante.*) Her argument ignores the facts that she used at least two false names in and before 1972 ("Gwen James" and "A. Chang") and inferably used two more in 1975 ("Joan Shimada" and "Mignon Wong"); that Brandt called himself "Baker" and "Barrows" in 1972; and that the persons in possession of the contents of the garage were inferably using any of a collection of spurious aliases identified in the garage itself. (See fn. 5.)

The existence of a recorded permit in any of these names would require the People to eliminate each codefendant as the holder. The burden of proving such negatives is precisely what the rule of convenience is designed to avoid. (*People v. Maontalvo, supra,* 4 Cal.3d 328 at p. 334.) In the implausible—if not preposterous—event that appellant had an exonerating permit, the fact was "peculiarly within her knowledge" and there was nothing "harsh or unfair" in making her bear the burden of proving it. (*Ibid.*) The trial court did not err in refusing her instructions to the effect that the People bore the burden of proving the contrary.

### (3) ▮ *People's Exhibit 99*

This exhibit was a set of documents found in the search of the Berkeley garage in 1972. They include maps of Aspen, Colorado; a hand-drawn floor plan of a home; a handwritten list of personal data pertaining to four individuals described as "Robert (called Bob)," "Wife: name unknown to me," "Son: Craig—19 yrs.," and "Daughter: name unknown," followed by recitals of "General Information" concerning Aspen and the vicinity; and two handwritten lists of names described under the captions "Friend" and "Enemy." The codefendant Brandt's thumbprint was found on one of these documents. The police found with them a set

of snapshots of various views of the outside of a house. (The snapshots were produced as a companion exhibit.)

The People called Katharine N. Craig, who identified herself as a sister-in-law of former Secretary of Defense Robert S. McNamara. She testified to the effect that the documents and photographs described or referred to the McNamara family and its vacation home at Aspen, Colorado. Appellant objected to her testimony, as well as to admission of the documents and snapshots. The trial court overruled these objections, and admitted the disputed exhibits, stating to the jury: "I am not admitting . . . [the exhibits] . . . for the truth of any matter asserted. . . . I have taken the legal position that all the items which were found in the garage are fundamentally admissible to show who, if anyone, was in possession of the articles in the garage and what, if anything, the purpose of the assemblage of materials there in the garage were [*sic*]."

Appellant asserts that, despite this limiting admonition, the exhibits "contained a statement, direct or implied, that a plan existed to kill or assault Robert McNamara and his family." She contends that they were admitted on the basis that appellant was part of a conspiracy to execute this plan, and that they were inadmissible because they were hearsay evidence and the foundational requirements of the "co-conspirator exception to the hearsay rule" had not been met. (See Evid. Code, § 1223; *People* v. *Leach* (1975) 15 Cal.3d 419, 431, fn. 10 [124 Cal.Rptr. 752, 541 P.2d 296].)

This argument is valid only if the exhibits were "hearsay evidence," which is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove *the truth of the matter stated.*" (Evid. Code, § 1200, subd. (a) [italics added].) For purposes of this definition, the term " '[s]tatement' means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." (*Id.*, § 225.) Some entries on the handwritten documents appear to qualify as "statements" within this definition. (See *People* v. *Allen* (1976) 65 Cal.App.3d 426, 433-434 [135 Cal.Rptr. 276].)

However, their truth or falsity—or the import of any message they conveyed—was not at issue until the testimony of Ms. Craig tended to explain what they meant. They were therefore not hearsay because they were not in themselves "offered for the truth of the matter stated," as the court explained in admitting them. Ms. Craig's testimony was not hearsay

because she gave it in court. The combination was obviously admissible because of its relevance to show the element of specific intent "to injure, intimidate, or terrify any person, or . . . to wrongfully injure or destroy any property," involved in a violation of Penal Code section 12303.3 as charged in count four. (See fn. 1, *ante.*) No error appears.

(4) ■ *The Instruction on Reasonable Doubt*

The trial court initially instructed the jury on reasonable doubt by giving CALJIC No. 2.90 and language from former CALJIC No. 22.[18] These and the other instructions went to the jury room in written form. The jurors then deliberated for five days, with occasional interruptions for the rereading of testimony and instructions. On the fifth day, the foreman reported that they were at a "standstill" but that they had taken only two ballots.

On the next day, they requested that the court reinstruct them on specified subjects. When the judge reached a point calling for a rereading or explanation of "reasonable doubt," he proceeded with a partly improvised discourse in which he read the substance of the first three sentences of CALJIC No. 2.90 (see fn. 18, *ante*); explained them by referring to his "personal opinion" that the term "moral" in that context was to be equated with "mortal,"[19] "moral evidence" with "mortal

[18]CALJIC No. 2.90 appears in the current edition (CALJIC (3d ed. 1970)), and the court gave it as prescribed by Penal Code section 1096: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows. It is not a mere possible doubt; because everything relating to human affairs, and depending on *moral evidence,* is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a *moral certainty,* of the truth of the charge." (Italics added.)

The court continued: "Absolute certainty, that degree of proof which removes all possibility of error, is not required. Such a degree of proof is rarely if ever possible. *Moral certainty* only is required, that degree of proof which produces conviction in an unprejudiced mind." (Italics added.) This language was adapted from Instruction No. 22 as it appeared in the second edition of CALJIC. (CALJIC (rev. ed. 1958) No. 22, p. 40.) Former CALJIC No. 22 paraphrased former section 1826 of the Code of Civil Procedure. (See 20 West's Ann. Code Civ. Proc. (1955) § 1826.) It does not appear in the current edition of CALJIC, which was published after the Legislature repealed section 1826 in 1967. (See disposition note, 20 West's Ann. Code Civ. Proc. (1979 pocket part) § 1826.)

[19]The full discourse is too long to quote, but the judge developed his equation of these terms by saying: ". . . [W]hat does *moral* evidence mean? I think it means evidence given in good conscience in honesty, in sincerity. It could mean—look at it this way—'because everything relating to *mortal* evidence.' I think, my personal opinion, not supported by anybody, is that years ago somebody dropped a 't,' because when this instruction was

evidence," and "moral certainty" with "mortal certainty"; and reread the last sentence of CALJIC No. 2.90 and the language of former CALJIC No. 22 as previously given (see *ibid.*), but using "moral certainty" and "mortal certainty" as interchangeable terms.

Appellant claims prejudicial error on the authority of a long line of decisions establishing that an impromptu instruction on reasonable doubt is a perilous exercise. (See *People* v. *Garcia* (1975) 54 Cal.App.3d 61, 63-68 [126 Cal.Rptr. 275] and cases cited; see also Pen. Code, § 1096a.) They also demonstrate, however, that improvisation *as such* does not command reversal; only prejudicial error does. (See *People* v. *Garcia, supra*, at pp. 68-71.)

The error claimed here is that the court's digressive equation of "moral" with "mortal" (see fn. 19, *ante*) was incorrect, and that it had the effect of fatally diminishing the high-purposed import of "moral" with human fallibilities connoted by "mortal." The equation was incorrect, as an exercise in etymology, because "moral" and "mortal" have distinct meanings and linguistic roots. (See Webster's Third New Internat. Dict. (1967) pp. 1468 ["moral"], 1472 ["mortal"].) The judge nevertheless did not suggest that either term diminished the other, and he cited both in a context which correctly included CALJIC No. 2.90 and an explicit definition of "moral certainty" in the language of former CALJIC No. 22. (See fn. 18, *ante.*) That definition is accurate despite the repeal of the statute in which it originated. (See *ibid.*; *People* v. *Boothe* (1977) 65 Cal.App.3d 685, 690 [135 Cal.Rptr. 570].)

The unmodified language of CALJIC No. 2.90 and former CALJIC No. 22 remained with the jurors in written form. They did not return their verdicts on the first three counts until a full day after the court indulged in its discourse, and it was only then (and with reference to count four) that they announced themselves as "deadlocked." In these circumstances, the court's error was semantic but not substantive, and it could not have had the prejudicial effect claimed: i.e., we may declare the belief that any semantic error was "harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 1283, 24 A.L.R.3d 1065]; compare *People* v. *Garcia, supra*, 54 Cal.App.3d 61 at pp. 70-71.)

introduced into Anglo American law, people believed in divine evidence, that God through his angels came right down and interfered with the affairs of men, because that is what it says here. 'because everything depending upon human affairs and upon *mortal* evidence is open to some possible or imaginary doubt' . . . ." (Italics added.)

(5) ■ *The Claim of Misconduct
by the Prosecutor*

This claim is based on a trial episode in which the prosecutor is asserted to have shown some damaging material to the jury in a calculated and improper manner. The letter appellant was writing to "Dearest Brother" when she was arrested, and which was read to the jury (see the text at fn. 10, *ante*), was physically incorporated within a notebook seized at the San Francisco apartment. After the trial court had ruled that the letter was admissible, it ordered the other pages of the notebook stapled together because they were deemed irrelevant. At least one of these pages included a handwritten passage in which appellant had apparently described some incidents of her private sex life in graphic language which would commonly be characterized as obscene.

Prior to the trial court's ruling ordering certain pages of the notebook sealed by stapling, the People called a handwriting expert to establish that appellant had written the "Dearest Brother" letter. Before the witness took the stand, the prosecutor apparently placed photographic enlargements of samples of appellant's handwriting in the view of the jury. One of the graphic entries described above, referring to her sex life, appeared on one of the enlarged samples. Defense counsel immediately objected to its placement before the jury. The court stated that the prejudicial effect of some of the words on it "far outweighed their probative value," ordered the sample removed, and admonished the jury to disregard it. Appellant claims prejudicial misconduct by the prosecutor in displaying it to the jury in the first instance.

The display was undertaken before the trial court had ruled that the graphic entries in the notebook were to be sealed from view. The jury had previously been informed of various unconventional aspects of appellant's sex life in 1972 (such as her cohabitation with the codefendant Brandt, to whom she was not married). Some of this information had been brought out in the voir dire interrogation of the prospective jurors. Some of the graphic language used in the offending specimen also appeared in the "Dearest Brother" letter. The trial court reacted to the episode promptly and correctly. (See *People* v. *Fitzgerald* (1972) 29 Cal.App.3d 296, 312 [105 Cal.Rptr. 458].)

The "ultimate" test of appellant's claim is whether the full record demonstrates a reasonable probability that a result more favorable to her would have occurred in the absence of the misconduct attributed to the prosecutor. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521,

447 P.2d 913]; *People* v. *Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243].) Given the overwhelming evidence in support of her convictions on counts one, two and three (see fn. 7 and the accompanying text, *ante*), there is no semblance of that probability here. The claim is rejected.

(6) ■ *The Claim of Sentencing Error*

The trial court sentenced appellant after having expressed the view that it was "without jurisdiction" to grant her request for probation on the violation of Penal Code section 12312 charged in count three:[20] She contends that the court had previously been "persuaded that . . . appellant should be granted probation, and expressed a desire to do so"; that its jurisdictional view was an erroneous "assumption"; and that the cause must be remanded for resentencing so that the court's "desire" to grant her probation may be effectuated.

The statement relative to the court's "desire" is unsupported by the record. Its determination that it was "without jurisdiction" to grant probation was obviously based on the omnibus prohibition stated in Penal Code section 12311. (See fn. 20, *ante*.) Appellant's claim of error rests on a labored interpretation of the statutory context and the sequence in which sections 12311 and 12312 took effect in 1970. The context clearly supports the court's view that it lacked jurisdiction to grant probation. (See *ibid.*) Collateral contentions made in this regard need not be discussed. There is no occasion to remand the cause for further proceedings.

The judgment of conviction is affirmed.

Caldecott, P. J., and Christian, J., concurred.

A petition for a rehearing was denied May 3, 1979, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied June 14, 1979.

---

[20]Section 12312 appears with section 12311 in chapter 2.5 (commencing with § 12301) of title 2 of part 4 of the Penal Code. The pertinent context reads:
"Chapter 2.5
"Destructive Devices
"12301. . . . [describing the term ' "destructive device." as used in this chapter'] . . . .
"12311. No person convicted of a violation *of this chapter* shall be granted probation, *and the execution of the sentence imposed upon such person shall not be suspended by the court*." (Italics added.)
Section 12312 appears next. (See its 1972 text as quoted in fn. 1, *ante*.) Sections 12311 and 12312 were added to the Penal Code by separate bills enacted in 1970. (Stats. 1970, ch. 771, § 10, p. 1458, effective Aug. 19, 1970: Stats, 1970, ch. 1425, § 32.6, p. 2725. effective Sept. 18, 1970.)