David **CARTER**, Appellant
(Defendant Below),

v.

**STATE** of Indiana, Appellee
(Plaintiff Below).

No. 1184S457.

Supreme Court of Indiana.

Aug. 25, 1987.

Susan K. Carpenter, Public Defender, and David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., and Jody Cusson-Cobb, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

Appellant David Carter was convicted after a jury trial of two counts of robbery, a class A felony and a class B felony, Ind. Code § 35–42–5–1 (Burns 1979 Repl.). He was sentenced to consecutive terms of thirty-five years and fifteen years. Among the substantial issues presented by this direct appeal is whether a defendant who controlled his own defense as co-counsel may present a claim of ineffective assistance of counsel. We conclude that he cannot.

Carter was accused of robbing two businesses in Peru. The evidence at trial showed that he entered the Roberts Liquor Store on June 25, 1981, and demanded money. When the cashier hesitated, Carter struck him with a large caliber handgun and confiscated all the money in the cash drawer and in the cashier's wallet.

On July 29, 1981, Carter arrived at the Super-X Drugstore with shotgun in hand and demanded money from both the cashier and the pharmacist. They complied, and he fled. The robberies netted a total of about $1300.

Carter was charged more than two years later after one of his accomplices, Fred Logan, was arrested for an unrelated misdeed and gave police a "clean-up statement" about his own prior criminal activities. Logan's trial testimony was instrumental in obtaining Carter's convictions.

*I. Ineffective Assistance of Counsel*

At Carter's arraignment, a public defender was appointed to represent him. Carter filed a *pro se* "Notice that Defendant will Participate in his Trial" on January 13, 1984. (Carter is a self-styled jailhouse lawyer who claimed at the time to be earning approximately $600 monthly as a "law clerk" for a private attorney.) The trial court interpreted the motion as a request for defendant to act as co-counsel and initially denied it.

Nonetheless, Carter filed a motion to act as co-counsel on February 24, 1984. He withdrew that motion on March 6, after filing a *pro se* motion for appointment of new counsel. Carter subsequently renewed his effort to act as co-counsel through a motion filed March 26. This time, the trial court acceded to Carter's request and appointed him "co-counsel," without defining the parameters of that role. Once a defendant is recognized as co-counsel, however, the nature of his participation in his defense is within the sound discretion of the trial court. *United States v. Swinton*, 400 F.Supp. 805 (S.D.N.Y. 1975); *State v. Ames*, 222 Kan. 88, 563 P.2d 1034 (1977); *Fowler v. State*, 512 P.2d 238 (Okl.Cr.App.1973), *overruled on other grounds*, 602 P.2d 215 (Okl.Cr.App.1979).

Despite his lack of legal credentials, Carter chose to participate fully. He now seeks to advance a claim that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment. He cites numerous instances in which his public defender failed to make an objection or preserve alleged error. In each instance, Carter, as co-counsel, could have made the same objection or taken some action to preserve the error. Whether his reason was ignorance or strategy, Carter chose not to do so.

The record shows that counsel's representation was adequate under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing that counsel's performance fell below professional standards and that the defendant was prejudiced by this performance. However, we do not otherwise address the merits of Carter's ineffectiveness of counsel claim because we conclude that he cannot raise it under these circumstances.

The Sixth Amendment of the United States Constitution and art. I, § 13 of the

Indiana Constitution guarantee an accused the right to counsel at any critical stage of the prosecution where "counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157 (1967); *Pirtle v. State* (1975), 263 Ind. 16, 26, 323 N.E.2d 634, 639. Correlative to the constitutional right to counsel is the right of a defendant in a criminal proceeding to appear *pro se*. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). A defendant who proceeds *pro se*, however, must accept the burdens and hazards of self-representation. *Id.; Engle v. State* (1984), Ind., 467 N.E.2d 712. He may not assert a Sixth Amendment claim of ineffective assistance of counsel because he, in effect, would be alleging himself ineffective. *Faretta*, 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46.

■ Carter chose to be represented by both his attorney and himself. Although an accused has the constitutional right to represent himself *or* be represented by counsel, neither the federal nor the state constitution accords him the right to do both at once. *McKaskle v. Wiggins*, 465 U.S. 168, 79 L.Ed.2d 122, 104 S.Ct. 944 (1984); *Bradberry v. State* (1977), 266 Ind. 530, 364 N.E.2d 1183. The trial court had the discretion to grant or deny Carter's request to act as co-counsel. *Lock v. State* (1980), 273 Ind. 315, 403 N.E.2d 1360. Inasmuch as such requests are rarely granted in Indiana,[1] Carter's allegation of ineffective assistance of counsel under these circumstances is a novel claim.

Distinctly different policies underlie the right to counsel and the right to self-representation. The policy supporting the right of self-representation is personal autonomy. The defendant is the one who must suffer the consequences of his decision as to counsel; hence, he is entitled to choose his advocate, a lawyer or himself. *Faretta*, 422 U.S. at 820, 95 S.Ct. at 2533. The purpose of the Sixth Amendment guarantee of representation is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights and to assure him the guiding hand of counsel at every step in the proceeding. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

■ When an accused elects to be represented by counsel, he surrenders to his attorney the right to make certain binding decisions concerning trial strategy. The Supreme Court of Kansas explicitly held that a defendant who accepts counsel has no right to conduct his own trial or dictate the procedural course of his representation by counsel. *Ames*, 222 Kan. at 100, 563 P.2d at 1044–1045. The Tenth Circuit and the Michigan Court of Appeals have similarly ruled. *Rogers v. United States*, 325 F.2d 485 (10th Cir.1963); *People v. La-Marr*, 1 Mich.App. 389, 136 N.W.2d 708 (1965).

The United States Supreme Court has stated that a "defense may be made easier if the accused is permitted to be present ... for it will be in his power, if present, to *give advice* or *suggestion* or even to supersede his lawyers altogether and conduct

---

**1.** The same is true in other states. When confronted with a request for hybrid representation, many state courts require that the defendant choose between his constitutional right to counsel and to self-representation. *See, e.g., State v. Randall*, 530 S.W.2d 407 (Mo.App.1975); *State v. Thomlinson*, 78 S.D. 235, 100 N.W.2d 121 (1960); *People v. Hill*, 70 Cal.2d 678, 76 Cal.Rptr. 225, 452 P.2d 329 (1969), *cert. denied*, 406 U.S. 971, 92 S.Ct. 2416, 32 L.Ed.2d 671 (1972); *Miller v. State*, 86 Nev. 503, 471 P.2d 213 (1970).

This reluctance to grant co-counsel status to a defendant may be due, at least in part, to the problems inherent in hybrid representation. *See, e.g., Lock v. State*, 273 Ind. 315, 403 N.E.2d 1360. In affirming the denial of co-counsel

status to a defendant, the Texas Court of Criminal Appeals shrewdly predicted the situation with which this Court is faced today.

"[O]ne would have to pity the plight of the defense counsel who would have to put up with an unruly or untrained defendant. In case of a disagreement on a tactical matter, who would control? If the lawyer prevailed in his view of the strategy and a defendant were to be convicted, many claims of ineffective assistance of counsel would be raised. No doubt many civil suits against lawyers would be filed if such a hybrid type of representation were required."

*Landers v. Texas*, 550 S.W.2d 272 (Tex.Crim. App.1977).

the trial himself." *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674, 678 (1934). A similar conclusion was reached by former Chief Justice Warren Burger, who suggested to the National Public Defender Conference in 1969 that a represented client had only three decisions to make: (1) to plead guilty or not guilty; (2) to have a jury or non-jury trial; (3) to take the stand or not. 5 Crim. Law Rptr. 2161, 2162. In *Faretta*, the Supreme Court stated that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." 422 U.S. at 820 (citations omitted). The Indiana Court of Appeals cited this language favorably when ruling that an attorney's actions on behalf of his criminal client may be binding on that client, whether or not the client affirmatively approves of these actions. *Judy v. State* (1984), Ind. App., 470 N.E.2d 380, 381.

This Court has held that the decision to call a particular witness rests with defense counsel. *McCann v. State* (1983), Ind., 446 N.E.2d 1293. In *Coonan v. State* (1978), 269 Ind. 578, 382 N.E.2d 157, this Court noted that among the reasons a trial court might deny a defendant's request to act as co-counsel is the need to recognize counsel's power to make binding decisions of trial strategy. In the context of a post-conviction proceeding, this Court has held that, absent fraud, a client is bound by the acts and omissions of his attorney, and he cannot accept the benefits thereof and reject undesirable acts or omissions by his attorney. *See, e.g., In re Lee* (1964), 246 Ind. 7, 198 N.E.2d 231.

The thrust of the precedent on this subject is that an accused may not command all decisions of trial strategy and procedure unless he intends to represent himself. In light of this concept and the unique facts at hand, we believe Carter's form of representation was most like that of a defendant who proceeds *pro se* but also relies on standby counsel.

■ Despite the public defender's representation, Carter remained the captain of his defense team, calling all of the plays with the help of his veteran teammate, the public defender. Carter obtained discovery, filed several pre-trial motions, deposed witnesses and made arguments during court hearings, as did appointed counsel. At one point, Carter possessed discovery documents in his jail cell which appointed counsel did not have. The record also shows that certain trial strategies were employed at Carter's insistence, despite counsel's advice to the contrary. The record, as a whole, suggests that Carter retained the services of the public defender primarily to conduct the investigation which Carter's incarceration prevented him from doing. Carter otherwise appeared to control his own defense.

At trial, Carter cross-examined the State's chief witnesses, including the accomplice Logan. Other witnesses were questioned by both Carter and his public defender, and evidentiary objections arose from both. While Carter showed a rudimentary knowledge of law, he proved to be relatively ineffective as his own advocate. He had been warned by the trial judge beforehand about the hazards of participating in his own defense. The court also made clear that as "co-counsel" Carter would be held to the same standards as a practicing attorney.

While the trial court chose to describe Carter as "co-counsel," the facts show that Carter represented himself with the help of the public defender acting as a liberally defined "standby counsel."[2] When Carter chose to take control of his own defense, under the pretext of acting as "co-counsel," he waived his right to allege a Sixth Amendment violation with respect to counsel's adequacy. By alleging his attorney

---

**2.** This state has traditionally limited standby counsel to a strictly advisory role. *See, e.g., Averhart v. State* (1984), Ind., 470 N.E.2d 666, *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 323. However, the determination of standby counsel's responsibilities is within the discretion of the trial court in Indiana. Several states applying the same standard have allowed standby counsel to take a much more active role. *See, e.g., Parker v. State,* 455 So.2d 130 (Ala.1984); *Houston v. State,* 246 N.W.2d 908 (Iowa 1976).

ineffective, Carter, in essence, is alleging himself ineffective; he not only was actively participating in his own defense but effectively managing the activities of the public defender. This was not a situation in which the public defender listened to the advice of his client and then pursued independently the route which he believed, in his professional judgment, was most beneficial. Carter defined the public defender's responsibilities and had the final say on all trial decisions.

Accepting Carter's allegation of ineffectiveness of counsel would distort the Sixth Amendment. He has attempted to take the benefits of his constitutional right to self-representation without accepting the burdens which are inherently attached. When he chose to circumscribe "the guiding hand of counsel" and navigate his own defense, Carter voluntarily traveled into the murky waters outside the safe harbor of the Sixth Amendment and sank any claim of ineffective assistance of counsel.

Practical considerations also support this conclusion. To allow Carter to participate in his defense to such an extent and then to assert this claim would encourage conduct contrary to the tenets of our judicial system. One of the essential reasons for counsel is the orderly pursuit of justice, a objective which is at risk whenever an accused plays the role of courtroom advocate. Defense efforts may be repetitious or contradictory when the defendant, as co-counsel, and his appointed attorney follow different legal routes. A particularly manipulative defendant might contravene his public defender's actions simply to create appealable error. Moreover, the law will not recognize errors which could have been remedied at the trial level. As co-counsel, Carter had the duty to speak if counsel was inappropriately silent.

We note in conclusion that our rejection of Carter's ineffectiveness claim rests upon his own substantial control of the defense. Had counsel been a true advocate within the meaning of the Sixth Amendment, rather than a tool for implementing Carter's self-representation, Carter certainly would have been entitled to present this claim.

## II. Sufficiency of the Evidence

Carter alleges that the evidence was insufficient to support the jury's determination that he committed both robberies. In addressing such a claim, this Court will neither judge the credibility of witnesses nor reweigh the evidence. We will affirm the conviction if, considering the probative evidence and reasonable inferences supporting the verdict, a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260, *cert. denied,* 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105.

■ Carter claims that Logan's testimony was inherently incredible and, without it, the evidence is insufficient. It is true, as the defense brief suggests, that some conflicts arose between the testimony of Logan and other State witnesses. Appellate counsel also is correct in noting that Logan, who was 21 years old at trial, admitted committing more than 30 felonies for which he was not prosecuted. However, the conflicts in the testimony were not material, and much of Logan's testimony was corroborated by other State's witnesses. The jury was fully aware of Logan's penchant for criminal activity but nonetheless found his testimony credible. When an accomplice is otherwise competent as a witness, the amount of weight to be given the testimony is a determination for the jury, not for an appellate court. *Asher v. State* (1969), 253 Ind. 25, 244 N.E.2d 89, *cert. denied,* 396 U.S. 821, 90 S.Ct. 61, 24 L.Ed.2d 72.

■ Carter further argues that the victim's inconclusive identification of Carter rendered the evidence insufficient for conviction. Inasmuch as an accomplice's uncorroborated testimony was adequate to justify the jury's verdict, *Griffin v. State* (1986), Ind., 501 N.E.2d 1077, unequivocal identification of Carter by the victims was not required.

## III. Requests for Mistrial

Carter claims error from the trial court's denial of his two motions for mistrial, both

of which arose out of statements made before the jury. The denial of a motion for mistrial will be reversed only upon a showing of an abuse of discretion by the trial court. Reversal is required only if the statement was so prejudicial as to have placed the defendant in a position of grave peril to which he should not have been subjected. The declaration of a mistrial is an extreme action which is warranted only "when no other action can be expected to remedy the situation." *Edwards v. State* (1984), Ind., 466 N.E.2d 452, 455 (citations omitted).

■ Carter contends the first mistrial should have been declared during the testimony of State's witness Carolyn Shelby, whose car was used in the robbery. The Court earlier had granted a motion *in limine*, barring evidence of any polygraphs conducted in the case. On cross-examination by Carter, Shelby testified that she did not know that Carter had used her car in the robberies until her discussions with the Kokomo police:

> Carter: What exactly did they tell you?
>
> Shelby: They told me that they thought David Carter had used my car in a robbery and I told them that I didn't know about it and I had to take a polygraph. .

The State objected, asking that the defense be instructed to refrain from further questioning about the polygraph. While Carter chided the State for inadequately instructing its witness concerning the order *in limine*, he did not object to admission of the testimony nor did he seek an admonition or a mistrial. Carter now claims that Shelby's answer was so prejudicial that the court should have ordered a mistrial *sua sponte*.

Reference to a polygraph in most cases should not be permitted. *Swan v. State* (1978), 268 Ind. 317, 375 N.E.2d 198. Here, Carter arguably invited the improper reference. It generated at most minimal prejudice because the results of the polygraph were not revealed. Carter's waiver of this issue in the trial court is immaterial because a mistrial, whether on his motion or that of the court, simply was not merited.

■ Carter contends that a mistrial also should have been declared during Logan's testimony. Logan stated that he accompanied Carter and a man identified only as "Richie" from Kokomo to Peru on July 29, 1981. Logan and "Richie" waited in the getaway car while Carter robbed the Super-X. With money in hand, Carter ran to the car and drove to a residential area in Peru. The three men waited in the parked car for several hours to avoid police detection before proceeding on rural roads toward Kokomo. After becoming lost, they stopped at a gas station, and Carter went inside to look at a map. Two police officers drove into the station. At this point in Logan's testimony, the following exchange occurred:

> Logan: They (the officers) started to go inside the store, and they gave us a real funny hard look, me and Richie when we was sitting in the car and they proceeded to go into the store and when they was going in, Davey was coming out and Davey came to the car and said told (sic) Richie, their ass is out, I mean I don't know what to say other than that. He told me that the field over there (sic) and if they come up here for me to take off running in the field, that he was not going back to the penitentiary....
>
> State: Pardon ... I'm sorry.
>
> Logan: He said he was not going back to the penitentiary.

Defense counsel moved for a mistrial on the basis of the "penitentiary" statement, noting that the court had entered an order *in limine* barring testimonial reference to Carter's prior convictions. The trial court denied the motion. Judge Embrey ruled that statements by a defendant relating to the crime or connected therewith are admissible, citing *Taylor v. State* (1982), Ind., 438 N.E.2d 294 (defendant's statement during rape that he had killed his mother properly admitted), and *Roddy v. State* (1970), 254 Ind. 50, 257 N.E.2d 816 (statement during rape that defendant was "not going back to prison again" properly admitted). The court offered to admonish the jury, but defense counsel declined, contending that

an admonishment would not effectively cure the harm.

Carter attempts to distinguish *Taylor* and *Roddy* by noting that the defendant's statements in those cases were made while the assaults were in progress, whereas his statement was made during his escape. Carter contends that a statement made more than three hours after criminal culpability attaches is not made during the "commission of the crime." *Reburn v. State* (1981), Ind., 421 N.E.2d 604. *Reburn* does not stand for such a broad proposition and, in any case, is factually distinct. Reburn's statement was made at a hospital far from the scene of the crime after she had been questioned by police. Carter's statement, on the other hand, occurred as he and his confederates were trying to abscond with the robbery proceeds from the site of the robberies. His statement occurred during the commission of the crime and thus was properly admitted.

### IV. Motion for Continuance

Carter was arraigned on January 3, 1984. He filed a motion for speedy trial three days later but subsequently requested a continuance. The trial court granted both motions and changed the original trial date of March 7 to April 30. Because of an extremely heavy docket, the judge warned the parties that "the earth will have to move to justify another continuance."

Undaunted, Carter filed a motion for continuance on April 17, seeking a "minimum" thirty-day delay. Pursuant to Ind. Code § 35-36-7-1 (Burns 1984 Supp.), Carter alleged the absence of material evidence and indicated that he needed additional time to complete discovery. The trial court noted that the defense, aided by a court-appointed investigator, had four months to handle the case and that all preparations could be completed before trial. The trial court denied the motion for continuance after arranging to secure the missing discovery items. Indeed, the "material" evidence soon appeared and most of the discovery problems were resolved within a week.

Carter filed another motion for continuance pursuant to Ind. Code § 35-36-7-1 on April 24. He complained of the absence of other material evidence, specifically Fred Logan's psychiatric records. The motion for continuance also alleged that:

> the defense attorney is not prepared to proceed to trial as scheduled for April 30, 1984, due to the continuing discovery being conducted, evaluation of said discovery and any further discovery and investigation necessary emanating from said new discovery, and the Sixth Amendment guarantees to the accused that he may be rendered effective assistance of counsel.

The trial court denied the motion after determining that the psychiatric records would be arriving that week. In fact, they did. When a motion for continuance is sought on grounds of the absence of material evidence and the trial court is satisfied that the evidence will be available, the court has the discretion to deny the motion. *Dockery v. State* (1974), 161 Ind.App. 681, 317 N.E.2d 453. Carter concedes that he was able to obtain some of the evidence prior to and during the trial but maintains that the denial of the continuance still constitutes reversible error.[3] He claims the late receipt of the evidence prevented him from being properly prepared and using the evidence to his best advantage during trial. The result, according to Carter, was a denial of his constitutional right to the effective assistance of counsel.

Continuances to allow for more time are not favored without a showing of good cause. *Keys v. State* (1979), 271 Ind. 52, 390 N.E.2d 148. The trial court's adherence to the April 30 trial date did not constitute an abuse of discretion. The court aptly concluded that four months was more than enough time to prepare the defense and that a continuance for further investigation was neither necessary nor appropriate.

### V. Lawyer as Witness

Defense attorney Charles Criss notified the court in February 1984 that his trial

---

3. The record shows that Carter had access to *all* of the discovery ordered by the court.

testimony could be necessary to impeach Logan at Carter's trial. Criss told the court that his testimony would concern a statement made by Logan while Criss was interviewing him in jail. According to Criss, Logan said that he gave a statement to police because his recently evicted girlfriend and children were waiting outside the interrogation room. Logan's statement to Criss, which Logan denied during a subsequent deposition, was not recorded. The State suggested that Logan may have been referring to any one of the many statements which he had given police in various cases and thus Criss' testimony was unimportant.

The trial court ruled that Criss was not required to withdraw because his proposed testimony was not material. The trial court did inform the parties that it would not prohibit the defense from questioning Logan about the prior inconsistent statement. The court at that time did not specifically address Criss' availability as a defense witness.

The defense never listed Criss as a witness. Aside from the comments made during the earlier hearing, the defense gave the State no indication before trial that it would call Criss. When Logan testified at trial, the defense employed a lengthy and effective cross-examination detailing Logan's many criminal acts and his many statements to police. During this barrage, Logan specifically denied that his family was in the police station at the time that he gave the statement implicating Carter.

The defense called Criss as a witness during its case-in-chief. The State objected, arguing that it had no notice that Criss would testify. The trial court asked Criss whether his name ever appeared on the witness list provided to the State and whether anyone else was present when Logan's allegedly inconsistent statement was given. Criss answered both questions in the negative. The court then ruled that Criss could not testify.

Carter characterizes this ruling as an abuse of the trial court's discretion to fashion a remedy for the defense's failure to comply with discovery requirements. Because the witness at issue is the attorney representing the defendant, the issue more specifically is whether the trial court abused its discretion when it refused to allow *counsel* to testify. *Worthington v. State* (1980), 273 Ind. 499, 405 N.E.2d 913, *cert. denied*, 451 U.S. 915, 101 S.Ct. 1991, 68 L.Ed.2d 306.

■ Although a lawyer representing one of the parties is not rendered an incompetent witness, the dual role of lawyer-witness should be avoided. *Id.* The ethical rules in force at the time of trial provided:

> Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

Code of Professional Responsibility, EC 5–9 (1986).

Logan had already been extensively impeached before Criss was offered as a witness. While Criss' testimony would have borne on Logan's bias, that evidence was not so probative as to require its presentation, in light of the policies weighing against defense counsel testifying as a witness.

■ Moreover, the defense had the court's permission to cross-examine Logan extensively about his prior statement to Criss. Instead, the defense chose merely to elicit Logan's denial of his family's presence at the police station and then follow up with Criss' testimony about Logan's prior inconsistent statement. Before a witness can testify about an extra-judicial statement made by another person, the

statement has to be offered to the declarant while he is testifying. *Carter v. State,* (1980), Ind. App., 412 N.E.2d 825. The defense never confronted Logan directly with his out-of-court assertion. Therefore, Criss' testimony about the statement, without more, would have been improper. As the defense never laid a proper foundation for impeachment by a prior inconsistent statement, Criss, attorney or not, could not have testified about it. In this sense, the defense's inability to enter this prior inconsistent statement into evidence was a result of failed trial strategy, rather than any erroneous ruling by the court.

### VI. Severance of the Charges

■ Carter next claims error from the court's denial of his January motion for severance. Carter alleged in the motion that the charges were joined for trial solely because they were of the same or similar character. Ind. Code § 35–34–1–11 (Burns 1984 Supp.) requires granting severance under such circumstances. The trial court denied the motion after hearing evidence that Logan participated with Carter in both robberies, that Logan's testimony would constitute the only direct evidence of guilt in each crime, that the robberies occurred within six weeks and six blocks of one another, and that the State's witness list for each charge would be nearly identical.

After encountering scheduling difficulties with one robbery victim, the State filed its own motion for severance the week before trial. The defense opposed the motion, contending that severance would require a "restructuring" of defense preparations. The trial court denied the State's motion, and the two robberies were tried simultaneously.

Ind. Code § 35–34–1–12(b) (Burns 1985 Repl.) provides:

If a defendant's pretrial motion for severance of offenses or motion for a separate trial is overruled, the motion may be renewed on the same grounds before or at the close of all the evidence during trial. The right to severance of offenses or separate trial is waived by failure to renew the motion.

Carter waived this issue when he opposed the State's motion for severance and otherwise failed to renew his earlier motion. *See, Anderson v. State* (1982), Ind., 431 N.E.2d 777. We find no merit in Carter's claim that he "was placed in the unfair and untenable position of either restructuring his defense preparations or opposing the eleventh hour severance." Removing one of the robbery charges could only have made defense preparations less cumbersome.

### VII. Instructions

■ Carter claims the trial court improperly refused three of his tendered instructions. The test for determining whether such refusal constituted error is threefold. First, the tendered instruction must be a correct statement of the law. Second, it must be required by the law, facts, and evidence of the case. Third, the tendered instruction must not be covered by any of the other instructions actually given to the jury. *Davis v. State* (1976), 265 Ind. 476, 355 N.E.2d 836.

■ The first instruction stated:

I instruct you that if you find that any witness who has testified in this case is testifying in exchange for immunity from prosecution or punishment for himself or with the expectation of receiving leniency or favorable treatment for himself relative to criminal activity which he himself is involved in, such testimony should be cautiously received and carefully scrutinized by the jury. And you have the further right and duty to consider whether such witness's testimony has been affected by his own personal interest or for personal advantage, revenge, or prejudice against the defendant.

Carter has failed to prove that this instruction was required by the law, facts, and evidence of the case. He claims that the evidence showed that Logan was not being prosecuted for his admitted participation in the robberies. That is indeed correct. However, the instruction addresses the testimony of witnesses who are receiving some benefit for their testimony. Neither

Logan nor any of the other witnesses at trial fit into that category. The evidence showed that it was police policy to refrain from charging people, like Logan, who gave a clean-up statement. Logan testified that he was there on his own accord and not in response to an offer of immunity or leniency. That statement was buttressed by the statements of the prosecutors involved in the case. While giving a similar instruction has been affirmed, *Joy v. State* (1984), Ind.App., 460 N.E.2d 551, this instruction was not relevant to this case and therefore was properly refused.

The other two instructions in dispute also were correctly rejected by the trial court. The second instruction stated:

> If the State of Indiana relies wholly on circumstantial evidence to prove its case, such evidence must be so conclusive as to exclude every theory or supposition of innocence.

The third instruction further defined circumstantial evidence and the weight which it is accorded. A trial court may properly refuse such instructions when the State presents direct evidence, such as Logan's testimony.

### VIII.  Competency of Logan

■ Carter claims the court erred in allowing Logan to testify without obtaining a psychiatric evaluation of him and conducting a hearing on his competency. During the defense case-in-chief, Carter called Dr. Kenneth Weissert, the psychiatrist who had been treating Logan at the Indiana Youth Center. Weissert testified that Logan suffered from extreme anxiety and depression and that he had attempted suicide. Outside the presence of the jury, the doctor stated that he had not attempted to determine Logan's competency as a witness and could not testify in that regard. Carter did not request a psychiatric examination of Logan or a competency hearing at any time before or during trial. Hence, he has waived this issue. *Bing v. State* (1966), 248 Ind. 30, 221 N.E.2d 886.

■ Carter is incorrect in claiming fundamental error from the trial court's failure to order *sua sponte* a psychiatric examination of Logan after hearing Weissert's testimony. All witnesses over the age of nine are presumed to be competent witnesses, and unsoundness of mind does not render a witness incompetent *per se*. The test is whether the witness has sufficient mental capacity to perceive, to remember, and to narrate the incident he has observed and to understand and appreciate the nature and obligation of an oath. *Ware v. State* (1978), 268 Ind. 563, 376 N.E.2d 1150. Logan related the two robberies in great detail. His testimony was corroborated by other witnesses, and there is no evidence that Logan did not understand the obligation of an oath. Logan's competency was not open to serious question.

### IX.  Private Investigator

Soon after his arraignment, Carter filed a motion for appointment of a private investigator. The trial court granted the motion and allotted an initial $1500 in public funds to pay the investigator chosen by defense counsel.[4] The trial court placed two limitations on Carter's use of the investigator. First, before the investigator could interview any of the State's witnesses, Carter was required to give notice to the prosecutor and seek the permission of the Court. Second, the court ordered that Carter could not use the investigator to solicit information for civil suits which he had filed against various police and governmental agencies.

In his brief, Carter argues that "once a trial court reaches the decision that an investigator is necessary to protect the defendant's right to a fair trial, it is improper to place any restrictions on that investigator, simply because the court controls the purse strings, other than those restrictions which would be applied to an investigator hired by a defendant with sufficient funds to privately hire his own investigator."

Appointment of a private investigator is within the discretion of the trial court. *En-*

---

4. This budget was exceeded, and subsequently Carter was granted a total of several thousand dollars by the trial court to cover the costs of the private investigator.

*gle v. State* (1984), Ind., 467 N.E.2d 712. If the appointment of the investigator is within the discretion of the trial court, we conclude that it is axiomatic that the court may place some limits on how the investigator may be used.

■■■ The restrictions placed on Carter's use of the investigator were appropriate. Carter conceded in court that the investigator had accumulated evidence for his civil suits, in direct contravention of the court's order. In addition, the State reported at least one incident in which the investigator misidentified himself to a witness. Finally, Carter does not cite any particular effort which was thwarted by the trial court's order.

### X. Amendment to Robbery Statute

At the time Carter committed the robberies and at the time of trial, the robbery statute required either bodily injury or serious bodily injury to constitute a class A felony. Ind.Code § 35-42-5-1 (Burns 1979 Repl). That statute was amended during the 1984 legislative session to categorize a class A felony as one involving serious bodily injury and a class B felony as one involving bodily injury. The amendment went into effect September 1, 1984, after Carter was sentenced. 1984 Ind.Acts, P.L. 186, § 1; Ind.Code § 1-1-3-3 (Burns 1982 Repl.).

■■■ Carter requested at sentencing that the trial court reduce his class A felony conviction to a class B felony conviction to comport with the ameliorating effects of the amendment. The trial court refused, and Carter claims error. Because Carter was charged, tried, and sentenced before the amendment went into effect, it was not a denial of equal protection to sentence Carter according to the statute in effect at that time. *Watford v. State* (1979), 270 Ind. 262, 384 N.E.2d 1030.

### XI. Discovery Abuse by State

Within three days of Carter's arraignment, defense counsel requested that the prosecutor provide any information in his file pertaining to the case. He was given the probable cause affidavit and a state-

ment by Logan. On January 9, 1984, Carter filed a detailed motion for discovery which was granted by the court the next day. The court eventually ordered that the State file its response by February 8. Carter complained during a hearing on January 23 that he had not received any of the discovery ordered by the court. The court ordered the parties to exchange what information they had at the time. The prosecutor said that he did not have any of the requested documents at that time but would comply with the February 8 deadline. The State, as promised, filed its response on February 8 and a motion to amend that response the following day. Carter filed a supplemental motion for discovery on February 15. Two days later he requested a continuance of the March 7 trial date, alleging, among other grounds, that discovery was incomplete.

On February 21, Carter filed a motion to dismiss, alleging that the State's "intentional and/or negligent late tender of discovery" had violated his right to due process under the Fourteenth Amendment. He specifically alleged that the State had certain statements in its possession at the time of Carter's arraignment which it did not provide to the defense until February 8. In addition to claiming general prejudice in the form of trial preparation delays, Carter argued that his deposition of Logan on January 28 was impaired because at the time he did not have all of Logan's prior statements to police. The trial court denied the motion to dismiss.

■■■ The trial court is accorded deference in determining what constitutes substantial compliance with its discovery order and will not be reversed absent clear error. If a trial court finds that a discovery order has been violated, its choice of remedy for the violation is discretionary and will not be overturned absent a showing of abuse of that discretion. In selecting the proper remedy, the primary elements for the court's consideration are whether the breach was intentional or in bad faith and whether substantial prejudice resulted. *Dudley v. State* (1985), Ind., 480 N.E.2d

881. The exclusion of evidence as a sanction for discovery abuse is not proper unless there is a showing that the prosecution engaged in deliberate or other reprehensible conduct which thwarted the defendant's right to a fair trial. *Beavers v. State* (1984), Ind., 465 N.E.2d 1388. A defendant bears an even heavier burden when he seeks the extreme sanction of dismissal of the charges against him, although that is one response available to the trial court. *See, Robinson v. State* (1983), Ind., 450 N.E.2d 51.

Carter did not meet this burden. He did not even show that the State's conduct rose to the level of bad faith, much less deliberate misconduct. Indeed, much of the delay was attributable to the vast amounts of discovery sought by Carter. The record shows that the prosecutor conscientiously attempted to respond on a timely basis, but much of the information was in the custody of other police and state agencies outside the county in which the case was tried. While these other agencies responded slowly, much of the problem was caused by the fact that Carter had filed civil suits against them and their attorneys had to oversee the provision of any information to Carter.

Carter's claim of prejudice is also unpersuasive. If he felt that his deposition of Logan was inadequate, Carter could have scheduled another. He received all of the information mentioned in the motion to dismiss more than two months before trial.

### XII. Examination of Witnesses

Carter claims that the trial court prevented him from questioning two State's witnesses, Ann Morris and Carolyn Shelby, concerning threats allegedly made against them by the State. This argument is without merit.

The defense cross-examined Shelby extensively about her contacts with police. Shelby testified that the police kept "bugging" her by coming to her home numerous times and asking the same questions. However, she acknowledged in an earlier deposition that she felt no other pressure from police.

The defense subsequently questioned Morris about the frequency of her discussions with police but did not question her about any threats allegedly made by the State to induce her favorable testimony. Carter did call Morris to the stand on surrebuttal and asked her one question: whether she had learned that police had threatened to take Shelby's children away. Before Morris could answer, the trial court sustained the State's hearsay objection. The defense then attempted to call Shelby to testify concerning the threats. The State objected on the grounds that such a question would be outside the scope of rebuttal and counsel conceded that it was. On that basis, the trial court refused to allow Shelby to take the stand again, noting that no evidence with regard to Carolyn Shelby was produced on rebuttal.

The scope of rebuttal testimony is within the discretion of the trial court; its ruling will not be reversed absent an abuse of that discretion. *Berkley v. State* (1986), Ind., 501 N.E.2d 399. While evidence of threats against a witness is generally relevant and admissible, the defense had the opportunity on cross-examination to question both witnesses in this regard and, in fact, did so. The court did not improperly hamper questioning of Morris because the hearsay objection was well taken. Shelby's testimony was improper rebuttal and therefore was correctly refused by the trial court.

### XIII. Replacement of Counsel

Soon after his arraignment, Carter filed a *pro se* motion seeking the appointment of new pauper counsel. During the hearing on the motion, Carter said he would prefer to be represented by Grant Hawkins, a black attorney. Carter noted that he still would seek new counsel if Hawkins were not available. When asked for particular criticisms of Criss, Carter responded that he disliked Criss' reluctance to receive local collect telephone calls. Such calls were the only method of telephoning available to Carter during his incarceration. When

asked for other complaints about Criss, the following exchange occurred:

Carter: Basically just a personality conflict. I don't feel that I can trust my counsel in the matter (sic) that I feel I should be able to.

Court: Is there any particular reason for that?

Carter: Yeah, he's white.

Court: Your motion is overruled. That is not a good excuse.

Carter: All right.

Carter filed his second motion for appointment of new counsel in March. He again alleged a communication problem with Criss and reasserted that he lacked confidence in Criss' ability to represent him. In response to questions from the judge, Carter said that the communication problem resulted from Carter's fear that Criss would breach the attorney-client privilege. Carter suggested that Criss would reveal Carter's confidences to one of the investigating officers and to the prosecutor. After the judge praised Criss' past representation of indigent defendants in his court, the following colloquy occurred:

Court: If anything we have the opposite problem there at times that I think he ought to be communicating a few things that he won't because he thinks they are covered by that privilege. Do you have reason to believe that?

Carter: I do, but I ... I won't allege those reasons because I can't prove it.

Court: Well, if you can't allege them then I can't act on them. That sort of a vague allegation is simply not adequate. Is that the only thing that causes you some concern about Mr. Criss[?]

Carter: And his admission that he didn't feel like he could adequately represent me in this matter.

Court: Any other things you wish to bring to the Court's attention?

Carter: No. No.

Carter said his lack of confidence in his attorney's ability arose from Criss' suggestion that Carter represent himself. The court subsequently questioned Criss, who stated that he was confident that he could provide adequate representation. In explaining his suggestion that Carter defend himself, Criss told the court:

[T]he reason for that is that he knows the witnesses better than I do or would ever expect to know them. But the suggestion was made because he seems to have as much ability in legal matters in the court room as a good trial attorney. He is very articulate in framing questions and by reason of his knowledge of the witnesses he will know whether a witness is lying or not or not giving total information and can attack the answer. So I suggested to him to consider representing himself or acting as co-counsel.[5]

■ An accused does not have an absolute right to counsel of his own choosing. *Alexander v. State* (1983), Ind., 449 N.E.2d 1068. Furthermore, a defendant may not arbitrarily compel a trial court to discharge competent counsel. *State v. Irvin* (1973), 259 Ind. 610, 291 N.E.2d 70. The trial court properly denied each motion for appointment of new counsel because Carter failed to provide even a modicum of evidence in support of them. Neither a defendant's racial prejudice nor mere allegations of attorney misconduct are sufficient to justify replacement of appointed counsel. The constitutional right to counsel does not carry with it the right to the appointment of an attorney of a specified color. *Mitchell v. Thompson,* 56 F.Supp. 683 (S.D.N.Y. 1944). Any limitation on court appointments based on race or ethnic factors has no place in the administration of justice. *People v. Fitzgerald,* 29 Cal.App.3d 296, 105 Cal.Rptr. 458 (1972). The record reveals that Criss spent an inordinate amount of time and effort in defending Carter and that his representation was more than adequate.

*XIV. Newly Discovered Evidence*

■ Carter alleged in his *pro se* motion to correct error the presence of newly discovered material evidence which required the granting of a new trial. To this motion

---

5. This suggestion followed Carter's initial efforts to receive co-counsel status.

Carter attached a letter purportedly written by L. Brad Harness, Logan's cellmate at the Indiana Youth Center. The letter contained a statement by Harness to the effect that Logan intimated that he had lied about Carter's involvement in the robberies. The trial court, in its discretion, refused to allow evidence to be introduced at the hearing on the motion to correct error. *See, Harris v. State* (1981), Ind., 427 N.E.2d 658. Moreover, Carter did not enter the newly discovered evidence into the record through other means, such as through sworn affidavits under Trial Rule 59(H), Ind.Rules of Procedure. Thus, as appellate counsel concedes, there are no facts properly in the record which support an argument that newly discovered evidence existed.

The judgment of the trial court is affirmed.

DeBRULER, GIVAN, PIVARNIK and DICKSON, JJ., concur.